# THE STATE ex inf. ELLIOTT W. MAJOR, Attorney-General, v. KANSAS CITY.

## In Banc, March 2, 1911.

1. **FREEHOLDERS' CHARTER: Amendment: Charter Restrictions.** A city cannot by its freeholders' charter prescribe a method of amending the same, which in any wise restricts or enlarges the prescriptions of the Constitution of the State. Where the Constitution prescribes that the city charter may be amended by a proposal therefor, made by the lawmaking authorities of the city, and "accepted by three-fifths of the qualified voters of such city, voting at a general or a special election, and not otherwise" (which means three-fifths of the qualified voters voting on the proposition), a provision of the city charter declaring that before such proposed amendment shall be valid it shall be "accepted by three-fifths of the qualified voters at a general or special election" is void, because this charter provision is in conflict with the constitutional provision.

2. ――――: ――――: ――――: **Larger Percentage of Voters Than Constitutional Limitation.** A city is without any authority to amend its freeholders' charter except such as is conferred by the Constitution, and the same provision thereof that gave the city the power to amend, not only prescribed the votes necessary for that purpose, but said it should not be otherwise amended. The city has no power to require a larger proportion of the voters to give their approval of the amendment than the limit fixed by the Constitution. Where the Constitution requires the amendment to be approved by three-fifths of all those voting on the proposition the city has no power to require

State ex inf. v. Kansas City.

it to be approved by three-fifths of all the legal voters of the city. [Distinguishing State ex rel. v. White, 162 Mo. 533.]

3. ———: ———: ———: **Whole Clause Void.** Where the Constitution declares what proportion of the legal voters may amend a city charter, no provision in the charter doing the same thing is required, and a provision therein fixing a different proportion is void, and may be regarded as surplusage, and the balance of the provision therein relating to the several steps necessary to make the amendment will be held valid.

4. ———: ———: **Validity: Estoppel: Not Pleaded: No Exception.** Whether or not a freeholders' charter has the force of a legislative act, and whether or not, therefore, the city is estopped to question the validity of a provision therein, is not for adjudication unless pleaded. Estoppel must be pleaded to be available. Besides, if the finding of the special commissioner was against its validity, an exception to his finding should be saved.

5. ———: ———: **Requisite Vote: Three-Fifths of Those Voting.** The provision of the Constitution requiring an amendment to a city charter to be "accepted by three-fifths of the qualified voters of such city, voting at a general or special election, and not otherwise," means three-fifths of those voting at the election, and not three-fifths of all the qualified voters of the city. So that where 12,560 votes were cast at a special election for an amendment extending the city limits and 1,041 votes were cast against it, the amendment received the requisite proportion of the qualified voters, notwithstanding the city at the time had about 245,000 inhabitants. The word which differentiates such a provision from a provision from which words of similar import are omitted, is the word "voting," or "voting at such election."

6. **CITIES: Extension of Corporate Limits: Reasonableness.** Whether or not the attempt of a city to so extend its corporate limits as to take in a large tract of additional territory is reasonable, must depend upon the facts, circumstances and conditions of each case.

7. ———: ———: ———: **Things to Be Considered.** In determining whether the extension of city limits is so unreasonable as to be a fraud upon the law, many things are to be considered by the courts, among others: city advantages to additional territory; making regular city limits; uniform grade and alignment of streets and boulevards; sewer and other drainage; the conservation of the public health; police protection to property and citizens within the old and the new limits; and necessity to meet the needs of a rapid growth of a great industrial community, and the adaptability of the added territory to city uses. Judged by those tests, it is *held*, that an extension of

Kansas City's corporate limits, with a rapidly increasing population, which had already reached nearly a quarter of a million people, and wthin whose limits were 26.7 square miles or 17,088 acres, by adding 31.05 square miles or 18,872 acres, some of which was used for truck gardening, and 1239 acres of which was a park belonging to the city, was not so unreasonable as to justify the court in holding the extension void, in whole or in part.

8. ————: ————: ————: Industrial Growth. Where the land to be added by the extension of the corporate limits of the city is largely unoccupied, and has increased to a value that is in excess of any value for any agricultural use to which it could be put, and is needed for the proper development of the industrial life of the city, as is shown by the establishment thereon already of numerous industrial plants, and is also needed for railway uses, and is adapted to such uses, it will not be held to be a fraud upon the law to include such land within the extension.

9. ————: ————: ————: ————: Growth. A city can provide for its growth in industries, but it is difficult to lay down a general rule which will be a guide in all cases in determining just what growth will authorize an extension of its corporate limits for that purpose. But where a city has grown in fifty years from a mere village to a city of a quarter of a million of people, has increased in the last ten years by at least fifty per cent in population, is increasing at the rate of eight or ten thousand a year, and is in the midst of a rich agricultural region of wide extent, and the lands inside the present city limits are mostly occupied or are not available at reasonable prices for prospective healthy industrial enterprises, and the lands to be added, though "made" lands along a river bottom, or high and rugged hills, are yet adaptable to industrial uses, as is shown by the surrounding developments and the establishment of railroads and industrial plants, the extension will not be held to be unreasonable.

## Quo Warranto.

WRIT DENIED.

*Elliott W. Major*, Attorney-General, *Dana, Cowherd & Ingraham, R. E. Ball* and *Edw. J. White* for informant; *Martin L. Clardy* of counsel.

(1) The extension ordinance was not ratified by the requisite number of qualified voters of Kansas City, as provided by the Constitution of Missouri. The

Constitution provides that same should be accepted
"by three-fifths of the qualified voters of such city,
voting at a general or special election and not other-
wise." The undisputed evidence shows that the city
had over 55,000 qualified voters when the extension or-
dinance was voted on, and the return admits that the
population of the city was 325,000 and that the vote
on said extension was only 12,560 votes for and 1041
votes against said extension, or less than one fourth of
the "qualified voters of such city." Under the lan-
guage of the Constitution, it was essential that the
amendment extending the corporate limits of Kansas
City should be adopted by three fifths of all the quali-
fied voters of the city—who should express their choice
by vote, at a general or special election—and it was not
sufficient that simply three fifths of the few who voted
on the proposition, should ratify the proposed exten-
sion.  State ex rel. v. Sutterfield, 54 Mo. 396; State ex
rel. v. Francis, 95 Mo. 44; State ex rel. v. Brassfield,
67 Mo. 331; State ex rel. v. Mayor, 73 Mo. 435; State
ex rel. v. Wilkelmeier, 35 Mo. 103; State ex rel. v. Mc-
Gowan, 138 Mo. 187; School Dist. v. Oellien, 209 Mo.
464; Westport v. Kansas City, 103 Mo. 145; Dunn v.
Lott, 67 Ark. 591; Blair v. Brooks, 22 L. R. A. (N.
S.) 478; In re Denny, 156 Ind. 104; People ex rel. v.
Brown, 11 Ill. 478.  (2)  Whether the vote on the ex-
tension came up to the constitutional requirement or
not, it was clearly not in accord with the charter re-
quirement of the respondent.  The Charter of Kansas
City required that the extension should be accepted
"by three fifths of the qualified voters of Kansas City,
at a general or special election." The charter is the
constitution of the city and has the force and effect of
organic provisions and legislative acts for the govern-
ment of the city, and the respondent is estopped from
denying the binding effect of any of the provisions of
its charter.  Morrow v. Kansas City, 186 Mo. 684; State
ex rel. v. Field, 99 Mo. 356; St. Louis v. Fisher, 167

Mo. 660; Meier v. St. Louis, 180 Mo. 409. If the Constitution could be construed as requiring a less number of voters than the Charter required, it would be held to be a mere limitation upon the legislative power of the respondent, in no manner affecting its right to adopt a higher requisite, as to the number of votes required to amend its charter, and the requirement of the Charter, in this respect, would constitute no conflict with the Constitution. R. S. 1899, sec. 6399; State ex rel. v. White, 162 Mo. 533; Alexander v. People, 7 Colo. 155; Vance v. Ansill, 45 Ark. 400; Sanders v. Erwin, 49 Ark. 376; Dunn v. Lott, 67 Ark. 591. (3) The city extension in this instance is unreasonable and illegal in attempting to include forty-two square miles of territory, because the farming and timber land adjacent to the Blue river, on the east, and the 2600 acres in the east bottom of the Missouri river, are not needed for proper city uses and are not adaptable for prospective city purposes. The evidence shows that a district of farming country, for six miles, on either side of the Blue river, lying several miles east of the built up portion of Kansas City, and an arid uninhabited tract of 2600 acres, in the bend of the Missouri river, on the north, were included in this proposed extension. The courts of this State, or of any other, have never recognized the right of a municipality to include such a vast amount of farming and undeveloped land in any city extension, and if such a right can be recognized, on the part of a municipality, then there is no limitation, in law, upon their ability to expand, based upon the uses and character and adaptability of the territory included. The courts of this and other States have placed a limitation upon the right of municipalities to expand in such cases and denied the right in cases analogous to this proposed extension. State ex rel. v. McReynolds, 61 Mo. 203; State ex inf. v. Bellflower, 129 Mo. App. 138; State ex rel. v. Small, 131 Mo. App. 470; Vestal v. Little Rock, 54 Ark. 321; Latonia v. Hopkins,

47 S. W. (Ky.) 248; Hartington v. Luge, 33 Neb. 623; Langworthy v. Dubuque, 13 Iowa 86; Williamstown v. Mathews, 103 Ky. 121; Evans v. Council Bluffs, 65 Iowa 238; Dieman v. Fort Madison, 30 Iowa 543; Denver v. Coulehand, 27 L. R. A. (Colo.) 751.

*John G. Park* for respondent; *F. F. Rozzelle* and *John T. Harding* of counsel.

(1) The burden of proof is upon informant. State ex rel. v. Talbott, 123 Mo. 69; State ex inf. v. Standard Oil Co., 218 Mo. 324; State ex rel. v. Grimm, 220 Mo. 494. The presumption is in favor of the validity of the proceedings extending the city limits. State ex rel. v. Birch, 186 Mo. 221. Relator was given the right to open and close upon the theory that the burden was upon him. (2) (a) The proposal to amend the charter by extending the city limits was accepted by the majority required by the Constitution, enabling act and charter. "Such charter, so adopted, may be amended . . . and accepted by three fifths of the qualified voters of such city, voting at a general or special election, and not otherwise." Constitution, art. 9, sec. 16. "The ordinance extending the limits shall . . . be in the form of a proposed amendment to the charter and . . . accepted by three fifths of the qualified voters of such city voting at a general or special election." R. S. 1899, sec. 6399. "This charter may be amended at any time by a proposal . . . accepted by three fifths of the qualified voters of the city voting at a general or special election." Charter of Kansas City, art. 18, sec. 34. The proposals were accepted at a special election held April 16, 1909, at which 12,560 votes were cast in favor of, and 1041 votes against, the extension. This was the only question voted on. Under the foregoing provisions of the Constitution, statutes and Charter, it was not necessary that three fifths of all the qualified voters of the

city should assent, but it was sufficient if three fifths of those who voted assented. The words "voting at an election" are words of qualification reducing the number upon which the computation is to be made to those present and voting. State ex rel. v. McGowan, 138 Mo. 187; State ex rel. v. Mayor, 73 Mo. 435; State ex rel. v. Mayor, 37 Mo. 270; State ex rel. v. Brassfield, 67 Mo. 331; State ex rel. v. Wilson, 129 Mo. App. 242; School District v. Oellien, 209 Mo. 469; Belknap v. Louisville, 99 Ky. 474; Seward v. Water Co., 201 Mass. 453; Fritz v. San Francisco, 132 Cal. 373; Metcalfe v. Seattle, 1 Wash. 297; State ex rel. v. Lancaster County, 6 Neb. 474; Craig v. The Church, 88 Pa. St. 42. (b) Article 9, section 16, of the Constitution sets forth a complete, specific and exclusive method of amending the charter. Kansas City v. Stegmiller, 151 Mo. 189; Kansas City ex rel. v. Scarritt, 127 Mo. 650; St. Louis v. Dorr, 145 Mo. 466. "The city is denied the right to amend its own charter in any other way." City of Westport v. Kansas City, 103 Mo. 148. This section confers a power conditioned upon only two things, adoption by three fifths of the qualified voters voting at an election, and that the charter so amended shall always be in harmony with and subject to the laws of the State. Kansas City v. Stegmiller, 151 Mo. 200. This power so conferred cannot be curtailed. Kansas City v. Oil Co., 140 Mo. 467; Cooley on Const. Lim. (5 Ed.), p. 78. The section provides that charters so adopted may be amended in this way and not otherwise. The words "and not otherwise" are mandatory. Kansas City ex rel. v. Scarritt, 127 Mo. 658; Henderson v. Koenig, 168 Mo. 369; State ex rel. v. Stobie, 194 Mo. 57. The statute (R. S. 1899, sec. 6399) is compiled within this vote. Article 1, section 7, of the Charter, purports to require an acceptance "by three fifths of the qualified voters of Kansas City at a general or special election." To enforce it literally is to make it override article 9, section 16, of the Constitution. Sec.

6399, R. S. 1899, and article 18, section 34, of the Charter, a later and more potent provision. Where the Constitution provides that a city charter may be amended, bonds assented to, or public improvements ordered, by a certain majority "of the qualified voters voting at an election," and the statute requires the proposal to be agreed to by that majority of the qualified voters, there is a conflict between the Constitution and the statute in which the statute must give way. State v. Denny, 4 Wash. 135; Frost v. Central City, 134 Ky. 434; Duperier v. Viator, 35 La. Ann. 957; Dick v. Scarborough, 73 S. C. 150. The establishment of a rule for the extension of the limits of a self-governing city is not a matter of "purely local municipal concern." It involves the relations between the city and the State at large. It is a State governmental matter. People v. Los Angeles, 154 Cal. 224. Article 1, section 7, of the Charter, which, in terms, prescribes a different rule from that laid down in the Constitution and Enabling Act, must be disregarded. Section 7, of article 1, must yield to a later section on the same subject, section 34 of article 18. 26 Am. & Eng. Ency. Law (2 Ed.), 619; City of Westport ex rel. v. Jackson, 69 Mo. App. 148; Brown v. Commissioners, 21 Pa. St. 42; Harrington v. Trustees, 10 Wend. 547. When the language of a statute leads to a manifest contradiction of the apparent purpose of a statute, a construction will be adopted in harmony with that purpose, even though it modifies the literal meaning. Cole v. Skrainka, 105 Mo. 303. Repugnant sections will be so construed as to conform to the Constitution. Stump v. Hornback, 94 Mo. 26. It is the duty of the court to harmonize apparently conflicting sections and depart from literal meanings, if necessary. State to use v. Hemon, 70 Mo. 441. (3) (a) The attack on the extension as unreasonable is not a judicial question. The power to amend the charter includes the power to extend limits and annex territory. Westport v.

Kansas City, 103 Mo. 147; Kansas City v. Stegmiller, 151 Mo. 200. The only limitations are that the amendments must be adopted by a three-fifths vote of those voting, after publication had, and that they shall be in harmony with and subject to the Constitution and laws of the State. Kansas City v. Stegmiller, supra. Cities organized under article 9, sections 16, 17, 20, 21, 22 and 23, of the Constitution are free from the usual statutory regulations as to annexation of terri· tory. Such cities, by their charters and charter amendments, legislate for themselves. Their charters, so long as they are in harmony with the Constitution and General Laws, have all the force and dignity of acts of the General Assembly. State ex rel. v. Telephone Co., 189 Mo. 99; Barber Asphalt Co. v. French, 158 Mo. 534; Kansas City v. Bacon, 147 Mo. 270; Construction Co. v. Shovel Co., 211 Mo. 524. The courts will not examine an act of the Legislature nor a political act of the people to see if it is reasonable. Courts have nothing to do with the reasonableness or unreasonableness of acts of the Legislature. State v. Swagerty, 203 Mo. 517; Young v. Kansas City, 152 Mo. 661; Prior v. Construction Co., 170 Mo. 439. When the Legislature fixed the boundaries of cities, the courts did not review its action. Giboney v. Cape Girardeau, 58 Mo. 141; McCormick v. Railroad, 20 Mo. App. 640; St. Louis v. Russell, 9 Mo. 507; St. Louis v. Allen, 13 Mo. 400. In other jurisdictions where city limits are extended by popular vote, the courts refuse to interfere except when the law has been violated or fraud perpetrated. They say such questions are political, not judicial. People v. Los Angeles, 154 Cal. 220; Ivey v. Rome, 129 Ga. 286. (b) This extension is reasonable in fact. The finding of the commissioner that the territory annexed was needed by Kansas City for municipal purposes is supported by the greater weight of the evidence and, under the law, was the only finding he could have made. Vestal v. Little Rock, 54 Ark.

321; Copeland v. St. Joseph, 126 Mo. 432. The mere fact that some of the land included is used for agricultural purposes will not warrant a writ of ouster. State ex inf. v. Fleming, 158 Mo. 558. The inclusion of such lands is not necessarily unreasonable. Copeland v. St. Joseph, supra. Districts which require police supervision are properly annexed. Parker v. Zeisler, 73 Mo. App. 550. All of the land included in the annexed territory falls within one or more of the classes above enumerated.

KENNISH, J.—This is an original proceeding in this court, instituted by the Attorney-General, as relator, on the 5th day of February, 1910, by the filing of an information in the nature of *quo warranto* against the respondent, Kansas City.

The purpose and object of the suit, as shown by the prayer of the information, is that this court may adjudge illegal and void an alleged amendment to the charter of Kansas City, seeking to include within the limits of the municipality a large body of contiguous territory, and that the respondent be ousted of all power, rights and jurisdiction in and over the territory attempted to be annexed by the said pretended extension of its limits.

The facts alleged in the information as entitling the relator to the relief prayed for, briefly stated, are: That Kansas City is a municipal corporation, organized and existing under sections 16 and 17 of article 9 of the Constitution of this State. The territory over which it is alleged that Kansas City now legally exercises municipal power, also the territory sought to be included within its limits, as claimed under the pretended extension thereof, are particularly described by metes and bounds. Facts are alleged to show that at a special election, called for and held on the 6th day of April, 1909, for the purpose of voting upon a proposed amendment to the city charter extending the

limits of said city, such amendment failed to receive the majority of votes necessary for its adoption as provided by section 7 of article 1 of the charter of said city, and that, therefore, the proposed amendment was not legally adopted.

The relator then sets forth at length the facts showing the extent of the territory over which Kansas City now exercises jurisdiction as a municipal corporation, and the extent and character of the territory attempted to be included by the extension, and alleges: "That a great deal of the land thus attempted to be included within the limits of the city contained no habitation, and was so situated that it could not by any possibility be used for any city purpose, and was not in any way necessary for the conduct and administration of the affairs, business, control and jurisdiction of said city."

Specific tracts of land within the territory included by the proposed extension are described which, it is alleged, are used as agricultural lands and are not suited for, nor adapted to, city uses. Other facts are pleaded to show the alleged unreasonableness and, therefore, the invalidity of the action of the respondent, in seeking to extend its limits as attempted by the said proposed amendment to its charter.

The grounds upon which relator assails the alleged amendment are set forth as follows:

"(1). Because the said proposal of the law-making authorities of Kansas City, to extend the limits thereof, was not accepted by the requisite number of the qualified voters of said city, as fixed by the charter of said city.

"(2). Because of the condition and locality of vast portions of the land sought to be included within the limits, said lands being unsuitable for city purposes, disconnected with said city, and not divided into lots and blocks, and not suitable for such sub-division, the attempted incorporation of the same into the limits

of the city was beyond the power of the city and was unreasonable, illegal and void.

"(3). Because by reason of the condition and locality of vast portions of land sought to be included within the extended limits, said lands were given no additional advantages whatever, by reason of said proposed extension, and the burden of licenses, and general and special taxes, which the city is now attempting to enforce, would be without any compensating advantages whatever, and would be depriving the owners of said property of their property, rights and privileges without just compensation."

The relator further challenges the alleged amendment on the ground that it is in contravention of sections 21 and 30 of article 2 of the Constitution of this State, and of article 5 of the Amendments to the Constitution of the United States.

The respondent filed its answer and return to the information, in which it joined issue upon all of the facts alleged attacking the validity of the amendment of its charter. The respondent further pleads affirmatively the facts showing, as alleged, a compliance with all of the legal requirements necessary to be taken by respondent in the proposal of the amendment, the submission of the question to the qualified voters of the city at a special election held for that purpose, the legal adoption of the amendment by the qualified voters of the city, and that respondent ever since said election has exercised and is now exercising municipal power, authority and control over the territory so included within its limits.

Respondent further alleges facts showing the adaptability and necessity of the territory so annexed, for city purposes, and also facts showing generally the reasonableness of respondent's action in amending its charter so as to bring within the municipality the territory in controversy.

The relator denied each and every allegation of the answer and return.

The cause being thus at issue upon the pleadings, this court made an order appointing Kimbrough Stone, Esq., of Kansas City, special commissioner to take the testimony on the issues joined, and to report the testimony, with his findings of fact thereon, together with his findings as to the law, and to state his conclusions of law in his final report. It was provided in the order that exceptions to the findings of fact and law should be made by either party so desiring, within ten days after the filing of the commissioner's report.

A hearing was had before the commissioner and many witnesses testified on behalf of the respective parties upon the issues presented by the pleadings.

In due time the commissioner filed his report, as directed by the order of this court, finding for the respondent upon the issues of the case and recommending that judgment be entered in its favor and against the relator.

Relator filed exceptions to the report of the commissioner, and the case is now before this court for decision upon said report and relator's exceptions thereto.

The testimony, as reported to this court by the commissioner, is largely directed to the issue of the reasonableness of the amendment of the charter in seeking to bring into the municipality for city purposes, lands of the character of those included by such amendment. Aside from such issue there is little conflict in the testimony, and even upon that issue many facts are not controverted. These facts as found by the commissioner and upon which there is substantial agreement, may be summarized as follows:

Kansas City was incorporated and now exists under a special charter, framed and adopted by authority of the provisions of sections 16 and 17 of article 9 of the Constitution of this State. Upon the 6th

day of April, 1909, pursuant to a proposal made by the lawmaking authorities of Kansas City, a proposed amendment to the charter, extending the limits of the city so as to include a large body of contiguous territory, was submitted to a vote of the qualified voters of said city, at a special election held for that purpose. At this election 13,601 votes were cast, of which number 12,560 were in favor of the amendment and 1041 were against it. The amendment was declared adopted, the limits declared extended in accordance with the proposal submitted and the respondent has ever since been exercising municipal authority in all of the territory thus sought to be annexed. .

At the date of the special election there were approximately fifty thousand qualified voters in Kansas City.

The territory included within the limits of Kansas City prior to the alleged amendment of its charter and the territory included after the limits were so extended, are described in the information with particularity and at considerable length, but for the purpose of this statement of facts, the more concise description and outline of the commissioner is deemed sufficient. It is as follows:

"The old city was bounded on the west by the Kansas state line and on the north partially by the Missouri River and partially by lowlands extending southward from the river. The most easterly line included some two miles of the valley of the Blue River, extending south from a point a short distance south and west of where the Blue River enters the Missouri. The remainder of the eastern boundary is rather a southeastern boundary, extending irregularly west and south to within two miles of the state line, from which a fairly regular southern boundary extends to the state line. The new limit begins at the state line several miles south of the old boundary, runs, with one single jog, directly eastward to the southeastern

corner of Swope Park and thence northward in an irregular line, including that park and the Blue Valley, to the Missouri River, and up that river to the old northern boundary.

"The old limits held an area of 26.70 square miles or 17,088 acres. The new limits enclosed 57.75 square miles, or 36,960 acres, an increase of 18,872, or a little better than as much again as was in the old city.

"Viewed from the standpoints of the location, nature or uses of the land, the new territory logically and naturally divides itself into three sections: The 'East Bottoms,' the 'Blue Valley' and the 'Southern Territory.'

"Of this added territory, the 'East Bottoms' comprises all of that land bounded by the Missouri River on the north and east, and by the old limits on the west and south.

"The 'Blue Valley' includes the territory along the Blue River between the old limits at Eighteenth Street on the north to Swope Park on the south, and from the new limits on the east to Cleveland Avenue (from Swope Park to Twenty-seventh Street) and the old limits on the west. It also includes a narrow oblong strip between the old and new limits, and just south of the mouth of the Blue River.

"The 'Southern Territory' lies between the old and new southern limits and between the state line on the west, and Swope Park and Cleveland Avenue (south of Forty-ninth Street) on the east.

"Outside of these three general sections is Swope Park and a small tract of land adjoining and southeast of the old limits."

It is shown by exhibits introduced in evidence by respondent that electric railways extend into the annexed territory, and by other exhibits that forty additions have been surveyed and platted as residence property, thirty-one of which are in the "Southern Ter-

ritory," eight in the "Blue Valley," and one in the "East Bottoms."

The population of Kansas City at the following dates, as shown by the United States Census Reports, was as follows: In 1890, 132,716; in 1900, 163,752; and in 1910, 248,318.

The testimony upon the controverted issue as to the reasonableness of the amendment of respondent's charter will be reviewed at length further on in this opinion.

The exceptions to the report of the commissioner, filed by the relator, contain ten separate grounds of objection. We shall not set out these objections at length, for the reason that the contentions of the relator may be more concisely stated as they appear in the briefs on file and as made at the oral argument in this court. They are as follows:

"(1). The extension ordinance was not ratified by the requisite number of qualified voters of Kansas City, as provided by the Constitution of Missouri.

"(2). Whether the vote on the extension came up to the constitutional requirement or not, it was clearly not in accord with the charter requirement of the respondent.

"(3). The city extension in this instance is unreasonable and illegal in attempting to include 42 square miles of territory, because the farming and timber land adjacent to the Blue River on the east, and the 2600 acres in the east bottom of the Missouri River, are not needed for proper city uses and are not adaptable for prospective city purposes."

The foregoing statement of facts is deemed sufficient for the purposes of this opinion, except upon the issue of the reasonableness of the charter amendment, which, as above stated, will be dealt with later on.

233 Sup—12

## OPINION.

The first question presented by the record in this case is as to whether the proposed amendment to respondent's charter was accepted by the required number of the qualified voters of Kansas City.

No question is raised as to the regularity of the proceedings in the proposal of the amendment, or as to the regularity of the special election held pursuant thereto. Neither is there any controversy as to the facts upon which the question of law is raised as to the sufficiency of the vote upon the proposed amendment. As found by the learned commissioner, "the vote in favor of the extension of the corporate limits did not equal three-fifths of the total number of voters who were qualified to vote at that election, but it was more than three-fifths of those actually voting at the election."

The information challenged the validity of the amendment, so far as the vote necessary for its legal adoption is concerned, only on the ground of its failure to be accepted by three-fifths of the qualified voters of Kansas City, as required by the charter of said city. But the question has now broadened and relator attacks the validity of the amendment under both section 7 of article 1 of respondent's charter and section 16 of article 9 of the Constitution of this State.

Sections 9703 and 9704 of the Revised Statutes of 1909 (Enabling Act), also contain provisions bearing upon the vote necessary for the amendment of a charter of a city organized under said section 16. They are referred to in the briefs herein, but as these provisions are identical with the Constitution, so far as the vote is concerned, except the presence of a comma not found in the statutes and which does not affect the meaning, they will receive no further consideration.

Section 16 of article 9 of the Constitution of this State and section 7 of article 1 of respondent's charter,

so far as applicable to the question under considera-
tion, are as follows:

"Section 16. . . . Such charter, so adopted,
may be amended by a proposal therefor, made by the
lawmaking authorities of such city, published for at
least thirty days in three newspapers of largest cir-
culation in such city, one of which shall be a newspaper
printed in the German language, and accepted by
three-fifths of the qualified voters of such city, voting
at a general or special election, and not otherwise; but
such charter shall always be in harmony with and
subject to the Constitution and laws of this State."

"Sec. 7. . . . Before such proposed amend-
ment to the charter shall be of any force and effect, it
shall be submitted to and accepted by three-fifths of
the qualified voters of Kansas City at a general or
special election provided by ordinance for such pur-
pose."

The language of the charter providing that before
the proposed amendment shall be of any force and
effect, "it shall be accepted by three-fifths of the quali-
fied voters of Kansas City at a general or special elec-
tion," must be construed, under the decisions of this
court, as requiring three-fifths of all the qualified vot-
ers of the city, and not three-fifths of those voting at
the election. [State ex rel. v. Sutterfield, 54 Mo. 391;
State ex rel. v. Francis, 95 Mo. 44; School District v.
Oellien, 209 Mo. 464.]

Upon the assumption of the foregoing construc-
tion of the charter, the relator advances the proposi-
tion that even though the language of the Con-
stitution be held to mean three-fifths of the qualified
voters who vote at the election, it was within the power
of the respondent to provide higher requirements for
the amendment of its charter than that prescribed by the
Constitution, and that if the Constitution be construed
as requiring a less number of votes than required by
the city charter, "it would be held to be a mere limi-

tation upon the legislative power of the respondent, in no manner affecting its right to adopt a higher requisite." This contention assumes that it was the purpose of the framers of the Constitution to fix a minimum vote, below which the charter could not be amended, but left the city free to go as far in the other direction in raising the vote as in its discretion it might choose to go, however difficult or even impracticable it might thus become to amend the charter.

The following question is thus presented, namely: Where the organic law of a municipality prescribes the conditions and requirements under which an act may be done, is it competent for the city to add other conditions and other requirements?

In discussing this question it may be assumed that a city existing under a charter provided by general law sustains substantially the same relation to the act under which it is organized, and from which it derives its powers, as a city organized by special charter under section 16 of article 9 of the Constitution, sustains to the latter instrument.

In the case of State ex rel. v. Gordon, 217 Mo. 103, it appears from the facts stated that the city of Carthage, through its legislative body, had submitted a proposition to the voters, authorizing the incurring of an indebtedness. The statute authorizing the indebtedness provided that fifteen days' notice of the election ordered to test the sense of the voters upon the proposition, should be given by publication in a newspaper in such city. The ordinance ordering the election provided for notice as provided by the statute, and in addition "by notices posted in three public places in each ward of the city." The notice was published in the newspaper as required by the statute, but notices were not posted in public places as required by the ordinance. Passing on the question of the sufficiency of the notice thus given, this court, following the authority of the case of Hamilton v. Village of

Detroit, 83 Minn. 119, said: "As section 6351, supra, only requires fifteen days' previous notice of the election, by publication in a newspaper published in the city, which was done, that part of section 5 of said ordinance requiring notices to be posted in three public places in each ward of the city, was unauthorized and invalid, and the notice, as published, well enough."

Discussing the same question, in the case of State ex rel. v. Denny, 4 Wash. 135, the court said: "The position of the relator is that this constitutional provision is a limitation upon the powers of the municipality in amending its charter; that the framers of the Constitution intended to surround freeholders' charters of cities of the first class with safeguards; and that, as one of these safeguards this provision was placed in the Constitution as a limitation upon the power of the city in relation to the amendment of its charter. He maintains that it was not intended to prohibit the people constituting the municipality from requiring and placing upon themselves further limitations and restrictions in the matter of amendments. Therefore, while the Constitution adopts a liberal method of procuring amendments, it is entirely within the power of the city itself, by its original charter, to adopt a strict method, such as is supposed to be involved in the word 'thereat.' . . . The framers of the Constitution went out of the usual way of making such instruments to insert a provision therein, looking to the possible solution of a perplexing modern problem—the government of large cities. It granted to certain cities the right to govern themselves, subject only to general laws of the State. The grant was made in the shape of power to enact a charter law and to amend it afterward. Just how far this grant was independent of legislation, we are not called upon to say; but it may be safely said that wherever in this grant it is declared that a thing may be done in a certain way, when it comes to be done, the doing of it in that

way will be sufficient. 'Whenever the language con-
tains a grant of power, it was intended as a mandate.
Whenever the language gives a direction as to the
manner of exercising a power, it was intended that the
power should be exercised in the manner directed, and
in no other manner.' [Varney v. Justice, 86 Ky. 596.]
'When the Constitution defines the circumstances
under which a right may be exercised, or a penalty
imposed, the specification is an implied prohibition
against legislative interference to add to the condition,
or to extend the penalty to other cases.' [Cooley,
Const. Lim. (5 Ed.), p. 78.] The power to amend is
in this instance as important as the power to enact.''

A further citation of authorities as to the power
of a municipality to add conditions to those prescribed
by its organic law, should not be necessary in this case,
when the exclusive and prohibitive character of the
language of the Constitution is considered. This lan-
guage provides that the charter adopted pursuant to
the provisions of the first part of the section, may be
amended by a proposal therefor, made by the law-
making authorities of the city, and "accepted by
three-fifths of the qualified voters of such city, voting
at a general or special election, and not otherwise.''

Whatever the construction may be as to the vote
required by the language quoted, it leaves no room for
doubt that by the vote there prescribed, neither more
nor less, can the charter be amended. By expressly
providing for the manner of amending the charter, the
acceptance of the same by the requisite number of
qualified voters, and by the addition of the words "and
not otherwise," this constitutional provision is made
self-enforcing, prohibitive, and not subject to change
or modification, either by charter enactment of the city
or by act of the General Assembly. The law as to
prohibitions in constitutions is stated in American and
English Encyclopedia of Law (2 Ed.), vol. 6, page 913,
as follows: "It is the prevailing doctrine, though

there is contrary authority, that prohibitory constitutional provisions are self-executing without regard to legislative sanction, and that their scope and purpose cannot be restricted by adverse legislation.''

Under the decisions of this court, the power of the respondent to amend its charter and the vote necessary therefor, like the power to adopt the charter in the first instance and the vote required for that purpose, is derived directly from the Constitution, and no charter or legislative provision was necessary in either case. Discussing the question as to the necessity of legislative authority by the respondent in another case, in order to exercise the power of eminent domain, this court in the case of Kansas City v. Oil Company, 140 Mo. l. c. 466, said: ''The authorities cited by the learned counsel for defendant as to the necessity of a grant of power have no application to a city charter which derives the power of condemnation of lands for public purposes directly from the organic law of the State in such unequivocal terms. It is not a matter of inference, but a direct grant of the necessary power. But that there might not be the semblance of a doubt of the power of the city to exercise eminent domain for such purposes the General Assembly of this State passed an enabling act which was approved March 10, 1887 (Laws 1887, p. 42). . . . Upon legal principles it cannot be seen what efficacy there was in this legislative act. The power with its limitations had been previously conferred by the people of the State and it was not within the power of the Legislature to curtail it.''

And in the case of Westport v. Kansas City, 103 Mo. 148, in discussing the same constitutional provision, the court said: ''That part of section 16 of article 9 of the Constitution, before quoted, declares in plain terms that these adopted charters may be amended by a proposal therefor, made by the lawmaking authorities of such city and accepted by three-fifths of the

qualified voters, voting at the election, and not otherwise. Thus it will be seen that the method by which the city itself can make the amendment is not only pointed out, but the city is denied the right to amend its own charter in any other way.''

Two points are earnestly urged in relator's supplemental brief which are entitled to consideration in this connection. It is contended that: ''In this State the per cent of voters ratifying the extension, required by the Constitution, in no manner affects the right of the city to adopt a higher requisite, or a greater number of votes to amend its charter.'' And the case of State ex rel. v. White, 162 Mo. 533, is confidently relied upon as sustaining relator's position.

The point decided in the White Case was that, where the Constitution provided that ''no county seat shall be removed unless two-thirds of the qualified voters of the county, voting on the proposition at a general election, vote therefor,'' such constitutional limitation did not render invalid a statute requiring a higher vote than that named in the Constitution, to authorize such removal. The ground upon which that statute was held not inconsistent with the constitutional provision on the same subject was that, ''if the Constitution was silent on the subject the General Assembly would be absolute in its power; that power the Constitution silently recognizes and merely puts limitations upon it. . . . But in all other respects the subject is within the discretion of the Legislature, which can, if it sees fit, require a larger proportion of the voters to give their approval than the minimum limit prescribed by the Constitution.'' [Ib. pp. 541-542.] It is made clear in that case that in the absence of any constitutional provision on the subject, the General Assembly had full power in the matter of the removal of county seats, even without the formality of a submission of the question to the qualified voters of the county. The constitutional limitation merely took

from the General Assembly the power to remove a county seat and required that such removal should be provided for by general law, and further provided that no county seat should be removed unless two-thirds of the qualified voters of the county voting on the proposition should vote therefor. It was held that this limitation left the General Assembly with all of its former power over the subject except in so far as it was expressly limited by the Constitution; that, being possessed of general legislative power, it was competent for the General Assembly to provide any conditions not in conflict with the Constitution and, therefore, to require a higher vote.

The doctrine of the White Case is not applicable to the case at bar, for the reason that the city is without any power to amend its charter, save as conferred by the Constitution, and the same provision of that instrument which gave the city power to amend not only prescribed the vote necessary for that purpose, but said it should not be amended otherwise. Therefore, the same source to which alone the city must look for its power to amend, "denied the right to amend its own charter in any other way." [Westport v. Kansas City, supra.]

The other point made in the supplemental brief is that "the ordinance extending the limits is based on section 7 of article 1 of the charter, and if it is found that this section of the charter is void, the whole ordinance and extension would fall with it."

There is no merit in this point. Section 7 of article 1 of the charter makes provision in detail for the several steps necessary to be taken in amending the city charter so as to extend the limits of the city, including the passage and publication of an ordinance, the holding of a special election, canvassing the vote and declaring the result, upon all of which the Constitution is silent, very properly leaving the same for charter regulation. This section also contained a pro-

vision as to the vote necessary for the adoption of the amendment, but as that vote was already definitely fixed by the Constitution, no charter provision was required, and that part of the section attempting to prescribe a different vote may be treated as void, without in any manner affecting the validity of the many other and independent provisions of the section.. No proposition of law is better settled than that "when the provisions of an act or ordinance are separable, if the act or ordinance, excluding the unconstitutional parts, is capable of being exercised in conformity with the legislative intent, the whole act will not be declared void;" and no case can be instanced more aptly illustrative of this doctrine than that of said section 7 of respondent's charter.

For the reasons given, we approve the finding of the commissioner upon this question of law, and hold that it was not within the power of the respondent, by any charter provision, to require a different or greater vote for the amendment of its charter than that prescribed by section 16 of article 9 of the Constitution of this State.

The point is made in relator's brief that the charter of respondent, under which the said election for the extension of the city limits was held, has the force of a legislative act within the corporate limits of the city, and that, therefore, the city is estopped from denying the validity of any of the provisions of its charter with reference to the requisite number of votes prescribed for the adoption of an amendment thereto. It is recognized law that the doctrine of estoppel is available as an issue in a case only when it has been made such by proper pleading, and as that issue has not been made by any pleading in this case it is not properly before the court and, therefore, need not be considered. Besides, the finding of the commissioner on the question of estoppel was against relator and no exception was filed to the report upon that finding.

The next question for determination is whether the words, "accepted by three-fifths of the qualified voters of such city, voting at a general or special election, and not otherwise," as found in said section 16 of the Constitution, mean three-fifths of all the qualified voters of the city, as maintained by relator, or three-fifths of the qualified voters who vote at the election, as contended by the respondent and as found by the commissioner.

If relator's contention be correct then, under the undisputed facts, the proposed amendment was not legally adopted and the finding of the commissioner cannot be sustained.

It has been the policy of this State, as indeed of republican forms of government generally, to refer certain matters chiefly of local concern to the determination of the qualified voters of the locality particularly interested and which is to receive the benefits and bear the burdens. Because of this policy, constitutional and statutory provisions have existed since the early history of this State, and now exist, authorizing the qualified voters as therein prescribed, to decide as to the location or removal of a county seat; as to the adoption by counties of township organization, the law restraining animals from running at large, or the law prohibiting the sale of intoxicating liquors; also as to the incurring of indebtedness for specified purposes by counties, townships, municipalities and school districts, and the adoption or amendment of municipal charters, as in the case in hand. Many cases, involving the construction of such constitutional and statutory provisions, have been before the courts of last resort of this State, and a few have been decided by the highest court of the land. So that although there may not be entire harmony in the decisions, or a decision exactly in point, there is no lack of authority to guide to a correct conclusion upon the question before us.

The constitutional provisions and statutes providing for the exercise of certain powers or the doing of certain acts by local subdivisions of the State, when authorized by a prescribed number of the qualified voters of the locality affected, in so far as the required vote is concerned, may be divided into three classes:

First: Those in which the vote required is of the qualified voters of the locality, without restriction, and of which the following may be cited as an example, namely: "The General Assembly shall have no power to remove the county seat of any county, unless two-thirds of the qualified voters of the county, at a general election shall vote in favor of such removal." [Constitution of Missouri of 1865, art. 4, sec. 30.]

Second: Those in which the vote required is of the qualified voters, voting at the election at which the question submitted is to be determined, and of which the following is an example, namely: "The General Assembly may provide, by general law, for township organization, under which any county may organize whenever a majority of the legal voters of such county voting at any general election, shall so determine." [Sec. 8, art. 9, the Constitution of 1875, as it existed prior to its amendment in the year 1902.]

Third: Those in which the vote required is of the qualified voters voting on the proposition, and of which said section 8, article 9, of the Constitution of 1875, as amended in the year 1902 and as it now exists, is an example, namely: "The General Assembly may provide, by general law, for township organization, under which any county may organize whenever a majority of the legal voters of such county, voting upon that proposition, at any general election, shall so determine."

The language used in the third class is so clear and explicit that no question can arise as to its meaning, and therefore it need not be considered further.

The language of the constitutional provisions and

State ex inf. v. Kansas City.

statutes falling within the first class named, ever since the case of State ex rel. v. Sutterfield, 54 Mo. 391, has uniformly been held by this court to mean that the proposition submitted must be accepted or approved by the prescribed proportion of the qualified voters of the county or other subdivision to which the question is submitted, and not merely by such proportion of those who vote at the election. [State ex rel. v. Sutterfield, 54 Mo. 391; State ex rel. v. Brassfield, 67 Mo. 331; Webb v. Lafayette County, 67 Mo. 353; State ex rel. v. Walker, 85 Mo. 41; State ex rel. v. Francis, 95 Mo. 44; State ex rel. v. Harris, 96 Mo. 29; Russie v. Brazzell, 128 Mo. 93; State ex rel. v. White, 162 Mo. 533; State ex rel. v. Gibson, 195 Mo. 251; State ex inf. v. Russell, 197 Mo. 633; School Dist. v. Oellien, 209 Mo. 464.]

On the other hand, where the assent of the requisite proportion of the qualified voters, as in the second class, is followed by the words, "voting at an election," or words of similar import, the decisions hold, with equal uniformity, that all that is necessary for the adoption of the proposition is that it be accepted or approved by such proportion of the qualified voters who vote at the election. [State ex rel. v. Brassfield, 67 Mo. 331; Webb v. Lafayette County, 67 Mo. 353; State ex rel. v. Mayor, 73 Mo. 435; State ex rel. v. Walker, 85 Mo. 41; State ex rel. v. Harris, 96 Mo. 29; State ex rel. v. McGowan, 138 Mo. 187; State ex rel. v. Gibson, 195 Mo. 251; State ex inf. v. Russell, 197 Mo. 633; School Dist. v. Oellien, 209 Mo. 464; State ex rel. v. Wilson, 129 Mo. App. 246.]

An examination of the decisions, and of the various constitutional provisions and statutes construed therein upon this question, makes it clear that the word used to differentiate the one class from the other is the word "voting." Omitting that word from a provision of the second class, the requisite proportion of all the voters qualified to vote upon the proposition

as in the first class, is at once required. We have then such a provision as the courts have always construed as contended for by relator in this case. It thus becomes apparent that under the contention of the relator the word "voting" is rendered redundant and of no effect in the constitutional provision governing the amendment of respondent's charter. The courts have not so regarded the use of that word in the cases cited, and it may be safely asserted that in no case decided by this court has it ever been held that where the word "voting", is used as in the language of said section 16 under consideration, a majority of all the voters entitled to vote was intended.

If there was one subject more than another upon which the learned men who framed the Constitution of 1875 were capable of speaking with precision and so as to convey the exact meaning intended it was in providing for submitting to the voters questions for their determination by majorities prescribed in matters of local concern. And the word "voting", found in so many different places in that connection, was evidently intended to have a well defined meaning, a meaning which the courts have always recognized and given effect to.

In the case of State ex rel. v. Gibson, 195 Mo. 251, the court had before it for consideration section 8, article 9, of the Constitution, as it existed prior to the amendment of 1902, namely, "Whenever a majority of the legal voters of such county, voting at any general election, shall so determine," and at pages 258-259 it is said: "It will be observed that the Constitution authorizes the Legislature to provide for the adoption of the township organization law by the vote of a majority of the legal voters of the respective counties voting at any general election, while the statute quoted provides for the adoption of such law by the vote of a majority of those voting at the election, on the question of the adoption of the law. It is

clear from the provisions of the statute that, however small the number of votes cast at any general election upon a proposition authorizing the adoption of the township organization law, so that a majority of the legal votes cast on that proposition be in favor of its adoption, that is all that is necessary for its adoption. It is not so, however, under the Constitution, which in order to the adoption of such a proposition, requires that a majority of all the votes cast at such election be in favor of its adoption.'' The court thus held the statute, which required a majority of those voting at the election on the question of the adoption of the law, invalid, because in conflict with the Constitution, which required a majority of all the votes cast at such election and not a majority of all the qualified voters of the county.

Having before it for consideration the same section of the Constitution, and the same statute enacted pursuant thereto, this court, in the case of State ex rel. v. McGowan, 138 Mo. l. c. 194, said: ''The general power of the Legislature to frame a statute for township organization is clearly limited by the terms of the organic law above quoted. Hence section 8427 cannot be accepted as authorizing the adoption of such a proposal by a vote of less than the majority of the legal voters of the county, who happen to vote at the election in question.'' Referring to the language thus quoted, the Commissioner in this case pertinently comments as follows: ''The language there interpreted is not only in the Constitution, but is a part of the same article of that instrument in which is found the clause now in question. It is fairly assumable that language so nearly identical, used in such similar connections, had the same meaning in the minds of those who used both. Such was evidently the idea of the court in this case for (page 194) it is said, 'On the other hand, some sections of the Constitution require majorities of the qualified voters, voting at an

election, to adopt certain measures.   [See sections 16 and 22 of article 9.]' ''

And in the case of State ex rel. v. Wilson, 129 Mo. App. 242, the language construed was, ''If a majority of the qualified voters of said townships, voting at any general or special election, shall vote in favor of so restraining such animals.''   Construing this language, the court at page 246 said: ''As the law now stands the stock law may be adopted in a county by a majority vote of those voting on the proposition, but when it is sought to adopt it in townships, there must be a majority voting for it of the voters who vote at the election.''

But in no case has this court more clearly distinguished between the language in the first and second classes above given, and the majority required, than in the recent case of School Dist. v. Oellien, 209 Mo. 464.   The language there construed was: ''And whenever a majority of the qualified voters and taxpayers of any school district, at any annual or special meeting called for that purpose, shall determine that it is necessary to have additional grounds for school purposes, then the board of directors may proceed to condemn and pay for any amount of land adjacent to the schoolhouse site, as provided in this section.''   One of the parties in that case maintained that a majority of those voting at the meeting only was necessary to the validity of the action taken, while the other maintained that a majority of all the qualified voters of the district, whether voting or not, was necessary.   Upon the contentions thus advanced this court said: ''It was not intended by the Legislature that, if there were only three present out of forty voters and taxpayers, the majority of those present at such meeting could fix this burden upon the school district.   If such had been the intent it could have been easily and plainly expressed by saying that the result should be determined by a majority of those present and voting at such meet-

ing." The court held that a majority of all the quali-
fied voters and taxpayers of the district was required.

In view of the fact that under the school district
law no voter can legally vote on the proposition to be
decided, unless present at the. annual or special meet-
ing at which it is submitted, the word "present" in the
foregoing quotation may well be omitted without af-
fecting the sense, and when so omitted the inference
necessarily follows that if the word "voting" had
been used in the language under review,. preceding
the words "at any annual or special meeting," as it
is used in the charter amendment provision of said
section 16 of the Constitution, then a different result
would have been reached by the court in that case.

The conclusion of the Commissioner upon the
question raised by the relator as.to the sufficiency of
the vote in favor of the adoption of the charter amend-
ment is: "That section 16, article 9, of the Constitu-
tion requires only three-fifths of the qualified voters
voting at the election, to adopt amendments to mu-
nicipal special charters." We approve such finding
and hold that it is fully sustained by the decisions of
this court.

There remains to be considered the question, was
the amendment of the charter reasonable?

Upon this issue the contest before the Commis-
sioner, and at the oral argument in this court, was
mainly waged. It is the important question in the
case, and is entitled to full and serious consideration.

Respondent has interposed a preliminary ques-
tion of law to which reference should be made. In its
brief in this court respondent has, for the first time,
challenged the right of the court to pass upon the
reasonableness of its action in amending its charter
for the reason that in so doing the qualified voters
of Kansas City were acting under authority directly
conferred by the Constitution of this State, and there-

fore, were engaged in a legislative act not subject to judicial review. This question we regard as different from that of the unreasonableness or oppressiveness of an ordinance or resolution enacted by the law making body of a city in the exercise of a delegated legislative power. In the latter case the right of judicial review is recognized law. This contention of respondent is not without support, but the question was not raised by striking at the information, or by the answer and return, or by exception to the finding of the Commissioner against respondent upon that issue and, therefore, it is not properly in the record for decision.

The evidence bearing upon the issue of the reasonableness of the amendment to respondent's charter has been so ably and fairly reviewed in the report of the commissioner, and his conclusions of law are so well fortified by the authorities cited, that we shall adopt that part of the report in this opinion, omitting such parts as set forth the testimony of the witnesses and, in part, the decisions of the courts upon questions of law, for the reason that while entirely proper and commendable in the report, their inclusion would unduly lengthen this opinion. It is as follows:

"WAS THE EXTENSION REASONABLE?"

"Relator challenges, with much force, this extension, alleging that it is unreasonable and cannot stand. Necessarily the range of inquiry involved in the question of the 'reasonableness' of any act must be rather wide. Obviously this range is very broad when the question is the reasonableness of the extension of the limits of a great city, involving, as it must, the numerous considerations which can and do enter into the element of 'reasonableness' and the almost countless facts which bear upon the existence of those considerations. The problem for the court is to examine the circumstances bearing upon the extension and in the light of that investigation, de-

clare that the extension is or is not so unreasonable that it should or should not be allowed to stand.

"It is no province of the court to substitute its own judgment of what would be the best or most advisable line for the extended limits; it is not its province to subtract or add to the territory selected by the municipality to be annexed; its sole duty is to examine the extension as actually attempted and to say whether it should remain. In short, the court is passing, in a purely judicial manner, upon the validity of an act legislative in its nature. It would be casually evident that many different considerations might bear upon this question of reasonableness and that the relative value—even the presence—of each would vary with every case. Later in this report will be set forth some of the different considerations which have been deemed of appreciable weight in cases involving questions of this character, and an application of such of them as are pertinent to the circumstances of this case will be attempted. It is from the facts of each individual case that the court must determine what considerations are involved, and what weight shall be given each. The facts of each case, therefore, are the primary consideration.

"Without now weighing the contentions of the parties, but as an aid and guide in considering the facts of this case, a general statement of the positions of the parties will be outlined.

"The respondent contends that all of the added territory is adaptable to city uses (residential, industrial or both); that it is worth, and is held at city values because of this adaptability; that all is needed for the systematical development of the city along intelligent and economical lines; that some portions of this territory are occupied by the growth of the city beyond its old limits; other portions are platted as additions to the city; other portions needed for present and prospective city residence or industrial purposes;

other portions are needed for the sanitary or police welfare of the city, of the included territory or of both; and some portions are deriving the benefits and advantages of the city.

"The relator contends that only a minor portion of the added territory should have been included; that the greater part is not at present utilized for any city purpose but is being used for farming, grazing and gardening, or is barren land not used at all; that the greater portion is sparsely settled and does not need or want city improvements or facilities; that the greater portion is not needed for city uses or purposes; that much of it is unsuitable to city purposes; that the greater portion would receive no benefit from annexation but would be subject to city taxation which in many cases would amount to confiscation; that a large part of the land cannot be made available for city uses without diking and filling which would cost more than the land is worth, and would be vastly more expensive than if done according to the present plans of the owners; that there is much vacant land within the old limits; and that, outside of a small part of the included territory, no additional territory is needed for the growth of the city.

"*Findings of Fact.*

"While the bulk of evidence is large and the field covered by it is wide, yet the inquiry has developed along certain fairly well defined lines. The most important of these are the location and extent of the annexed territory; its natural characteristics; its present uses; its adaptability for the city uses; the necessity of its inclusion; its values; and the benefits or detriments either to the city or to it.  .  .  .

"Of this added territory, the 'East Bottoms' comprises all of that land bounded by the Missouri River on the north and east and by the old limits on the west and south.

"The 'Blue Valley' includes the territory along the Blue River between the old limits at Eighteenth street on the north to Swope Park on the south, and from the new limits on the east to Cleveland Avenue (from Swope Park to Twenty-seventh Street) and the old limits on the west. It also includes a narrow oblong strip between the old and new limits, and just south of the mouth of the Blue River.

"The 'Southern Territory' lies between the old and new southern limits and between the state line on the west, and Swope Park and Cleveland Avenue (south of Forty-ninth Street) on the east.

"Outside of these three general sections is Swope Park and a small tract of land adjoining and southeast of the old limits.

"THE SOUTHERN TERRITORY: This section lies adjacent to the old southern boundaries and is fairly rectangular in outline. It extends north and south about three and one-half miles, east and west about four miles, and contains between ninety-five hundred and ten thousand acres. It is, for the most part, gently rolling land. Along the entire distance and roughly following the boundary of this section a small stream named Brush Creek runs eastward, finally emptying into Blue River. The southern watershed of Brush Creek extends southward to the crest of a divide running generally from the corner of Sixty-seventh Street and Cleveland Avenue, in a southwesterly direction to Seventy-fifth Street and state line. South of this divide the territory naturally drains easterly and southeasterly into the Blue River—some of the drainage entering the Blue within the new limits—a larger amount passing outside the new limits before reaching that stream.

"The northern slope of the Brush Creek watershed is closely built with dwellings and the southern slope is being rapidly filled with a nice class of city homes. Outside of one tract of about one hundred and

thirty acres of ground and occasional small parcels, this territory is not now used for agricultural purposes. Its character is essentially urban and close suburban. Much of the greater portion is platted as additions to Kansas City and much of that not occupied has been sold to city home builders on time payments.

"The sewage of this territory is cared for by private cesspools or is emptied into Brush Creek which thus becomes an open sewer. A pressing necessity exists for the installation of a sewer system which will care for the sewage of this section and keep it from flowing into Brush Creek.

"Relator admits the propriety of the extension over that part of this territory embodied within the Brush Creek watershed. He denies the propriety of that south of the divide. Little of this property lying south of the divide is in large tracts, and by far the greater part of it is platted as city additions into blocks and lots. Some of it built upon; some of it paved, with sidewalks; some of it supplied with water from the Kansas City municipal plant through mains laid by the property owners; some of it receives electric lighting current from the same plants which supply the city. Practically all of it is reached by three street car lines which are extensions of the city street railway system.

"The values of this land, while varying widely, are in excess of any possible usage except as city property or for high-class suburban homes, and such homes demand and should have conveniences which must be supplied by and from the city. This section, as well as that immediately north on the south slope of the Brush Creek watershed, is essentially city and close suburban residential property, is being used as such, and will be increasingly so used.

"The growth of this southern section as a residence quarter has been rapid and is continuing so.

"Swope Park is a large public park belonging to and being improved by the city. It contains about thirteen hundred and fifty-three acres. It is connected with the city by a street car line and boulevard and is a popular resort for people of the city.

"Blue Valley: The Blue River is a stream of some size, lying east of Kansas City and running in a northern direction into the Missouri River. It twists in and out along a valley varying in width from one-fourth to one mile, and containing between three thousand and four thousand acres of land. The valley is generally flat bottom land near the stream with slopes or bluffs upon the border. Some of these bluffs are abrupt and they range from a few feet up to over forty feet in height. This valley extends for about seven and one-half miles from Swope Park to the Missouri River. Of this distance, two miles toward the Missouri River lies within the old limits.

"Its present use is varied, but predominatingly a country use. It contains a number of manufacturing industries of various kinds. Most of these are located within or near that part of the valley lying within the old limits. One witness testified to having located forty industrial plants in the Blue Valley (almost entirely within the old limits), within five years. During the past few years the growth of industries in this valley has been considerable. Nearly all of this development has been within the old limits. The general character of those industries located in the Blue Valley, either within or very near the old limits, may be gathered from the partial list following: A large nut and bolt works; automobile works (owning thirty to forty acres); a large radiator manufacturing plant and a brass works. A few such industries are scattered in the valley between the old limits and Swope Park. At Leeds, a small unorganized settlement of two hundred or more people about two miles south of the old limits, is located a distillery, a food plant, a

rice mill (not in operation) and a lumber yard. In other parts of the valley, outside the old limits, are located a creosoting plant, where railway ties and timber are treated; a rock crusher, several quarries, a brick yard and plant, starch works and a stock food factory. Some of the witnesses think not over ten per cent of the land in the valley, outside the old limits, is used for manufacturing purposes.

"North of Swope Park, on the highlands west of the river and between the river and Swope Parkway, the land is platted and largely built on. . . .

"Outside of the above places the land, with the exception of some tracts not in use, is being, and has for years, been utilized for truck gardening, dairy farms, small pastures and small farms, has no city improvements and many of the owners and occupants want none. Within the five and one-half miles between the old limits and Swope Park there are five river crossings (bridge or ford) and the connection with the city is by rock or dirt wagon roads, some of which bear the names of city streets. The gardeners, dairymen and farmers occupying this land for the most part drive into the city, which is their market. That part of the valley within the old limits is fairly well supplied with street car service, having one line which crosses the valley at about Fourth Street, and another which comes to within three blocks of the Blue River, on Fifteenth Street. The new territory is served by street cars as follows: The Fifteenth Street line, above mentioned, parallels (three blocks inside of) the old limits; nine blocks south of this line another runs as far east as Brighton and Twenty-fourth streets, ending about a mile from the nearest point of the Blue River; three blocks south of this last line another ends at Twenty-seventh and Spruce Streets about one and one-quarter miles from the nearest point of the Blue River; four blocks south of this last line two lines end at Thirty-first Street and Indiana Ave-

nue, something over one and one-half miles from the
nearest point on the Blue; from Forty-ninth Street to
Sixty-third Street (the northern boundary of Swope
Park) the Swope Park car line parallels the general
direction of the river at a distance to the westward of
one-half mile to one mile from the winding thread of
the river; from Forty-ninth Street and Swope Park-
way a line, running cars hourly, extends down into the
Blue Valley; along the entire length of the valley on
the east side and south of the old limits an interurban
line has been projected, but so far has not been built.

"There are two railroads (the Missouri Pacific
and the St. Louis and San Francisco) running the
length of the valley; one other (Chicago, Rock Island
& Pacific) which runs up almost to Leeds before leav-
ing the valley, and a fourth (Kansas City Southern)
which runs some distance south of Leeds. A portion
of the valley on the west side of the river extending
some distance south from the old limits is not at pres-
ent connected with any railroad and could be con-
nected only by bridging the Blue River or by running
trackage northward or southward from where the
railways cross the river to the south and north. The
Kansas City Southern has a switch built across the
river to some abandoned coal mines just south of the
William Vineyard land. Streets are not extended into
the valley east of Topping Avenue.

"The market value of the lands along the valley
varies according to the location, the character of the
land and the witness. For farming and gardening
purposes they are estimated to be worth from $100
to $125 an acre, some is probably worth more than
this; the highest rental mentioned being thirty dollars
per month for a tract of thirty-three acres. That lo-
cated in the bottom is for all purposes more valuable
than that upon the slopes or highlands. That accessi-
ble to switches is more valuable. The market valua-
tions placed by the witnesses are based sometimes upon

large areas and sometimes upon particular tracts. In some instances the divergence of value is wide. The evidence upon this point was by those who owned or were interested in the tracts in question, or real estate dealers with more or less intimate knowledge of values in that vicinity. . .

"In spite of the wide divergence in the estimates of the value of land in the Blue Valley, one fact stands out prominently; the land has a value outside of and beyond any use for farming, dairying or gardening purposes. Its real value is founded upon its adaptability as city industrial property in the not distant future. This fact is well covered by the testimony of Allen L. McCoy, agent for the large McCauley tract, who testified that the value of that land was based upon its usefulness for factory and switch property.

"Brush Creek, itself an open sewer serving a large and increasingly populous territory, flows into the Blue River about two miles north of Swope Park. At a point within the old limits, a four-foot sewer, spoken of as the Goose Neck sewer, empties into the Blue, draining an area of four and three-fourths square miles. It also receives the sewage and drainage from the factories, farms and dairies in the valley and on the valley slopes. The Blue is sluggish and in times of low water becomes well-nigh closed at its mouth, caused by the filling at that point of both the Missouri and Blue Rivers. At such times the water becomes stagnant and so foul from sewage and filth that it is very offensive and unhealthy, particularly in the lower part of the river. The Blue is the natural drainage way for the greater part of the area of the city, old as well as new limits, thus caring for about twenty-three square miles. There was a pressing, increasing and immediate need, at the time of the extension, for some alleviation of and control over this sewer situation. There seems no dispute that Brush Creek should be relieved of the sewage poured into it by the construction

of a sewer large enough to serve the area of its nat-
ural drainage, and extending from the state line on
the west to or near the junction of Brush Creek with
the Blue.   There also seems no question that some
disposition should be made of the sewage from this
Brush Creek and the Goose Neck sewers to prevent it
entering the Blue.   This is demanded for the health
of the city at large, with particular reference to that
part within the old limits (below Eighteenth Street)
through which the Blue flows, and also for the health
of those who live in the Blue Valley.   .   .   .

"While railways do enter the city from the south
and east at other points, the Blue Valley is naturally
a railway gateway into the city, and, as said above, is
at present occupied for its entire length by the main-
line tracks of two large systems and part of its length
by the main-line tracks of two other large systems.   To
bridge the Blue would require bridge work of some
character for distances of around two hundred feet.
Naturally the engineers differ as to the expense and
character of the bridging necessary.

"The present free switching limit on the south is
Twentieth Street, although one plant located south of
there has made arrangements to secure this free ser-
vice.

"The bottom land traversed by these railroads is
flat, and varies in width from one-fourth of a mile to
one mile.   It is free from overflow except that portion
lying near the Missouri River and small isolated tracts
which are somewhat lower than the average surround-
ing bottom land.   .   .   .

"The popular name 'East Bottoms' is an index
to the character of this land.   It is an alluvial forma-
tion of the Missouri River created within the past
twenty years.   It is low and practically level.   The
differences in elevation are usually occasioned by some
slough bed and at the extreme do not exceed ten feet.
The general level of the land is about ten feet above

low water stage. Most of it is subject to annual over-flow, and all of it is overflowed in unusual rises of the river. The Missouri River has at times washed away considerable of this land, in 1883 taking four hundred acres of the Kanoky property, but in late years has been adding to it. The receding overflows leave deposits averaging eight inches. The soil is generally sandy, mixed in places with gumbo and clay. Considerable of this land is covered with a thriving willow growth and a good sized area with a medium growth of cottonwood timber.

"Some of the higher stretches are used for truck gardening, but the annual overflow has prevented much of it being used at all. These overflow conditions do not now ordinarily apply to that portion (about one-third) of the land south of the Kansas City Southern Railway Company track embankment, shown in exhibit three, which forms a barrier to any but exceptionally high water. This railway embankment is higher than the surrounding land. It is a substantial protection to the land south of it when the river reaches a stage of twenty-seven feet. In 1908, with the use of sand bags on its top it withstood thirty feet, though the situation becomes dangerous beyond twenty-seven feet. The ordinary annual rises bring the river to from twenty-one to twenty-four feet. In 1903 it reached thirty-five feet; in 1908, thirty feet; and in 1909, about thirty feet. The land so protected is used for factories, elevators, mills, railway yards and truck patches. North of the Kansas City Southern embankment, the land west of the Chicago, Milwaukee & St. Paul Railway Company track has a few houses and one elevator on it, but east of that track there are scarcely any houses of any character (one witness estimating the total number at twelve)—the few there being termed 'shacks' by the witnesses. None of it has ever been platted except one small portion, the plat of which was afterward vacated. No streets or city im-

provements of any character are on this land. There is one small schoolhouse which has been there a number of years. There are no roads regularly laid out and maintained as such. The nearest street car line comes to the old limits on the west and runs north a quarter of a mile along the old limit line.

"The Kansas City Southern Railway Company, the Missouri Pacific Railway Company and the St. Joseph & Grand Island Railroad Company, have main line trackage and yards; and the Chicago & Alton Railroad Company and the Chicago, Milwaukee & St. Paul Railway Company have main line trackage and land for yards, on this land. The Atchison, Topeka & Santa Fe Railway Company passes near the southeast corner of this land. The Missouri Pacific Railway Co. has about one hundred and fifty acres of yardage property. The Kansas City Southern main-line track is built upon an embankment, as said above, and the Chicago, Milwaukee & St. Paul Railway Company track is also upon an embankment, which gradually rises until, just before it reaches that company's bridge over the Missouri River, it attains considerably more than thirty feet in height, the average being from ten to twenty feet. . . .

"At present the land has no value for residential or agricultural purposes, its only reasonable present use being the growth of willows and cottonwood timber, with precarious truck gardening on a few of the higher ridges. J. P. Kanoky testified he had received no rentals and was not using his land (over one thousand acres), and H. M. Meriwether testified he derived no income from his more than six hundred acres, except from one sale of willows. Its present value springs entirely from its location near Kansas City and its adaptability, with flood protection, for railway yardage, factory, manufacturing and commercial usages. Its real value is in a sense prospective. Its certain usage is as industrial city property.

"Various estimates have been made both of the present and prospective (with flood protection) value of this land. These different values are as follows:

"J. P. Kanoky, owner of something over one thousand acres of this land, did not place any estimate upon the property except to say that he had been offered the Chamberlain tract for three hundred and fifty dollars an acre, and he believed it could be bought for less; that three years ago he bought part of the William H. Brown tract for from $100 to $175 per acre.

"John A. Moore testified that the present value of the property was $500 to $2500 per acre; that the part that does not overflow is worth $200 an acre for gardening purposes, and if this entire property was protected from overflow it would be worth $5000 an acre. . . .

"It would require flood protection to make this land attractive for city industrial uses. The city officials now have under consideration the formation of a drainage district in the East Bottoms to construct a levy which will protect all of this land. This district also includes East Bottom land within the old limits and embraces a total of thirty-seven hundred acres above low water mark and four hundred and thirty-seven acres below low water mark but within the harbor line. The estimated cost of such a levee is $1,750,000. If a levee were built, a drainage and pumping system would have to be installed to care for seepage and surface water in flood time. . . .

"In the western portion of this territory and in that part included within the railway yards, there is need of police protection, both for the territory itself and also for the city. The tracks are a rendezvous and lurking place for vagrants and police characters who get on and off trains there or rob freight cars which halt in the yards. Brawls requiring police interference are not infrequent, and the police have found gambling in the cars. The police have had occasion

to go quite far out into this territory (testimony of R. L. James). There is a police station inside the old limits. For a short distance outside the old limits the police had, before the extension, exercised some control. Two motor cycle men have been added to this station. . . .

"GENERAL FINDINGS: There are certain lines of evidence which can be best treated in relation to the entire subject rather than piecemeal in connection with each of the three sections of added territory already discussed.

"Such are the Boulevard and Park System, the Sewer System, the growth of the city and the need of additional territory for industrial development.

"BOULEVARD PLAN: The city is planning a system of boulevards which contemplates in the near future east and west boulevards in the new 'South Territory' along 63rd and 73rd streets from state line to Swope Park; and north and south boulevards through the same territory along the Paseo from 47th Street to the new southern limits, and another parallel with the Paseo and nearer the state line. Besides these, other boulevards, now in existence to the old limits, will be extended. Ultimately, a boulevard or driveway on both sides of the Blue River, from Swope Park to the Missouri River and thence following the proposed levee around the large bend of the Missouri River. The advantages of an early establishment of boulevards in growing territory are that it can be done at much less cost and that it helps shape the growth of the city along systematical and economical lines, placing the residential, business and factory portions of the city in the best and most economical relations to each other. I do not find, however, that the use of a boulevard upon the top of the proposed levee is a proper reason for including the East Bottoms within the extension or that the desirability of municipal control over the Blue River so as to make it, in time,

a pleasure and recreation spot for the city dwellers, is more than a cumulative reason for the inclusion of the Blue Valley at this time.

"SEWER PLANS: Exhibit 1 shows a comprehensive and far-sighted plan for handling the city sewage. This plan, while not finally determined upon by the city—in fact being rather the description of the tentative idea of the City Engineer—has been made the basis of expert opinions dealing with the sewer problems of Kansas City. Whether the best or most economical plan or not, it is true that the immediately present sewer necessity for including the Blue Valley could, so far as concerns the Brush Creek and Goose Neck sewage, be obviated by disposal plants at the mouth of the Goose Neck and contemplated Brush Creek sewers. But it is equally obvious that it will be only a few years until there will be a sewage draining directy into the Blue which will have to be cared for by an interceptor, large or small, along the west banks of that stream and that interceptor must form a natural link in the city sewer system. It could not rationally be treated as a separate proposition, as would be the case in the East Bottoms. So that, while that sewage does not demand particular attention today, it seems so certain in the near future that it will have to be cared for that it cannot be said to be entirely unreasonable to include this Blue Valley territory for sewer purposes. As to the east side of the Blue it may be said that only sufficient territory has been taken to include the immediate drainage area of that stream. In short, sewage necessity alone would not be great enough to require or justify the inclusion of the Blue Valley but it might be a partial or cumulative reason for so doing.

"CITY GROWTH: The growth of Kansas City within recent years has been exceedingly rapid. No large residential tracts remain unoccupied and practically all within the old limits has been platted and most of it.

built up. The population has flooded out into the added 'south territory' beyond the old limits and is rapidly building up that entire section with homes. As an index of the commercial growth, it has been shown in the testimony that within the past five years twenty-five large office buildings, several twelve or fourteen stories high, have been erected, and that within the same period seventeen new banks have been established. Bounded as it is on the west by the state line and on the north by the Missouri River, the growth of the city must for some time be in the southern and eastern directions.

"INDUSTRIAL LAND IN THE OLD LIMITS: Part of the city is upon the highland stretching back from the bluffs which border the bluffs of the Missouri and Kaw River valleys. That business activity requiring proximity to railway facilities is, from the standpoint of topography, confined to the Kaw River or 'West Bottoms;' the strip of ground called the 'Belt Line,' situated in a depression or 'Draw' from the West Bottoms to near the junction of the East Bottoms and the mouth of the Blue Valley, and through which runs the Kansas City Belt Railway; Brush and Mill Creek Bottoms, the West Bottoms, the Belt Line, a portion of the East Bottoms (the western end) and a part of the Blue Valley (between Eighteenth Street and the East Bottoms). Of these within the old limits the condition at the time of the limit extension seems to have been about as follows:

"The Mill and Brush Creek Bottoms were practically filled with residences and were surrounded by one of the nicest residence districts in the city. There was no railway in Brush Creek Bottom and only a switch ran up into Mill Creek. The West Bottoms were practically entirely filled with railway yards, freight houses, stock yards, factories and wholesale houses. Of the available vacant space all was high

priced, being worth from $60 to $300 a front foot or from $10,000 to $40,000 per acre. There has been practically none sold even at the prices which are prohibitive for most businesses. There will soon be approximately one hundred acres of new filled ground near the Missouri River put upon the market, which is worth from 75 cents to $2 a square foot, or some of it as much as $75,000 an acre. The Belt Line is only partially occupied. Some of its space cannot be utilized because too far above or below grade for short switches to be run from the tracks. It is also probable that with the completion of the New Union Station, with six passenger tracks running through the belt line, it will not be as attractive for switch property as heretofore. One witness, C. D. Parker, a real estate man and a former president of the Commercial Club, testified that it was the design of the terminal company to shift the freight terminals to the East Bottoms on the north side of the city. While the space along the Belt Line is fairly well filled as far east as Elmwood Avenue, the witnesses seem agreed that the larger part of the available space is yet vacant. This vacant property is also high priced, being worth from $1.25 to $4 a square foot; an acre contains 43,560 square feet.

"The Blue Valley within the old limits has contained industries for quite a period, but during the past few years this section has had a very rapid growth until now forty per cent of that space is occupied. There is no freight station in this section and the industries which have located there are for the most part those doing a carload business, and requiring several acres for their plants and shops. Several hundred acres of this area, near the mouth of the Blue, is low ground and subject to overflow and therefore undesirable for commercial purposes as long as it remains unprotected. The prices of land here are what might be termed medium, ranging from $3000 to $8700 an acre.

"That part of the East Bottoms within the old

limits was a long triangular strip, the base running
for over a mile along the bluff line from Broadway
to Grand Avenue eastward, with a perpendicular side,
somewhat shorter than the base, running northward
and to the river, which, curving rather sharply inward,
formed the hypothenuse. Excluding a small marshy
plot, it contained about 726 acres. Of this tract
about 400 acres belong to a syndicate and is known as
the Armour-Swift land. This Armour-Swift land has
recently been filled to above flood level. It has never
been put upon the market; is in litigation, which has
covered several years; is involved in several different
suits and is yet in the trial courts. Of the remaining
326 acres quite a good part is occupied by factories,
elevators, railway yards and small residences, although
a considerable portion is yet unoccupied except by
truck patches. Parts of this land have been on the
market for some time. One piece of several acres,
partly owned by H. M. Meriwether, was held at $1000
an acre, and has recently been held at $1500 without
sale. Many of the witnesses think that much of this
land, like the most of the East Bottoms, would have to
be protected from floods by dikes or filling before it
would be attractive or available.

"Industrial Needs: As one of the main grounds
for justifying the extension over the new territory
in the East Bottoms and Blue Valley is the need
of this added land for industrial growth and as it has
been sharply questioned whether or not inclusion with-
in city limits tends to attract or repel industries, it is
made necessary to find upon that point. While there
is seeming conflict in some of the testimony, yet that
disappears when the point of view of the witness is
gained. The gist of the testimony seems to be that
as a general rule industries require or desire some of
the facilities which a city furnishes—such as water,
gas, light, fire, and police protection, street car service
and nearness to labor. Those which do a carload busi-

ness, either in raw material or output, require switching facilities. Those which do less than carload business must be within hauling distance of freight stations. Some, like brick yards, are influenced chiefly by proximity to raw material, while some, like hay warehouses and powder magazines, require only railway facilities, and are safest where most isolated. All of them desire cheap ground and this is especially true of the smaller ones which usually have limited capital and the larger ones which require considerable space. Where an industry can procure outside a city limit everything desirable to it which it could obtain inside those limits, it prefers to be outside to escape city taxation—in some instances, city regulation. To my mind the strongest argument in favor of the view that most industries desire, if they do not require, city conveniences and that the city limits hold no terrors for them, is the fact that the very great percentage of those which have located in the Blue Valley have stopped within the city limits. It would seem unnecessary to add that practically all industries avoid locations subject to overflow.

"Both the East Bottoms and the Blue Valley offer the most attractive factory locations near Kansas City. The Blue Valley is at present preferred, although served by fewer railways and lacking the extent of territory of the East Bottoms, because most of it is free from overflow. The Blue will be made more attractive shortly through the working out of the plans for the new terminal service which will extend as far up as Leeds. The East Bottoms is shortly to have as part of the same terminal plans a sub-freight station which will enormously increase the attractiveness of that section, if freedom from flood be secured.

## "CONCLUSIONS OF LAW."

"The factors which have been regarded by courts in determining the 'reasonableness' of city boundary extensions are many. Sometimes one factor alone is of importance; sometimes several combine their weight to determine the matter. Each case must rest upon its own facts. [Plattsburg v. Riley, 42 Mo. App. 18, 22.] Some of these factors which have received the consideration of the courts, either standing alone or in connection with other elements, are as hereafter set out. This list is not intended to be complete, but rather as suggestive, in addition to the cases cited upon the points hereinafter discussed.

"Some of the following cases were under statutes, and the cases from Kentucky, Iowa and Nebraska are upon questions, not of the validity of annexation of territory, but of the right to levy municipal taxes upon agricultural land inside a city limits. In those three states is held the unique doctrine, everywhere else denied, that land can remain within the corporate limits of a city and not be subject to municipal taxation if its use is purely agricultural. The above cases are helpful, however, and are here cited.

"The leading case is Vestal v. Little Rock, 54 Ark. 321 (adopted and approved in Copeland v. St. Joseph, 126 Mo. 417, and Parker v. Zeisler, 73 Mo. App. 537). The rule there laid down is as follows:

"'Before considering them directly, we will state what we conclude from the many authorities to be the correct rule to guide in determining an application for annexation.

"'1. That the city limits may reasonably and properly be extended so as to take in contiguous lands (1) when they are platted and held for sale or use as town lots, (2) whether platted or not, if they are held to be brought on the market and sold as town property when they reach a value corresponding with the views

of the owner, (3) when they furnish the abode for a densely settled community, or represent the actual growth of the town beyond its legal boundary, (4) when they are needed for any proper town purpose, as for the extension of its streets, or sewer, gas or water system, or to supply places for the abode or business of its residents; or for the extension of needed police regulation, and (5) when they are valuable by reason of their adaptability for prospective town uses; but the mere fact that their value is enhanced by reason of their nearness to the corporation would not give ground for their annexation, if it did not appear that such value was enhanced on account of their adaptability to town use.

" '2. We conclude, further, that city limits should not be so extended as to take in contiguous lands, (1) when they are used only for purposes of agriculture or horticulture, and are valuable on account of such use; (2) when they are vacant and do not derive special value from their adaptability for city uses.'

"In 28 Cyc. 188, is the following statement of factors which may be of importance in determining the reasonableness of city annexation of territory.

" '(a)  Annexed territory has advantages of city;

" '(b)  Will make limits regular;

" '(c)  Secures uniform grade and alignment of streets in added territory;

" '(d)  Required by public convenience and health;

" '(e)  Necessary for enforcement of police ordinances;

" '(f)  Necessary to foster growth and prosperity of city;

" '(g)  Necessary for the extension of gas, water, sewer, street or police systems;

" '(h)  More adequate school facilities.'

"Relator contends rightfully that the addition of an undue amount of land not used for city purposes

would render the extension unreasonable. He says that condition is present here. The old limits held an area of 26.70 square miles or 17,088 acres. The new limits enclosed 57.75 square miles or 36,960 acres, an increase of 18,872 or a little better than as much again as was in the old city. Of these 18,872 additional acres, about 10,000 are included in the so-called 'Southern Territory', the propriety of the inclusion of which the relator admits. Swope Park, a municipal park, connected with the city by boulevard and street car service, and a great popular resort for the people of the city, is certainly properly included, because it needs care and policing and serves a very useful city purpose. [Parker v. Zeisler, 73 Mo. App. 537.] It accounts for 1,353 acres. North of Swope Park and west of Elmwood Avenue to the old limits lie approximately 2500 acres. Most of this, except the Vineyard property of 360 acres, is platted or built upon and is being rapidly settled up. Some of it, north of Swope Park, needs and desires police protection. In the East Bottoms the land south of the Kansas City Southern embankment is being occupied by factories, elevators, railway yards and roundhouses. Much of this territory, if not all of it, should have police protection for its own as well as the city's welfare. As said in Clark v. Kansas City, 176 U. S. 114, in deciding that railway property might be included under conditions not justifying the inclusion of agricultural lands: 'Besides, such uses or manufacturing uses adjacent to a city may, for its order and health, need control.' Also see Kansas City v. Railroad, 53 Pac. 468 (Kansas 1898.) Two of the members of the police board and the officers in command of the station including that territory all testified as to the necessity of active police control over a great part of this area south of the Kansas City Southern embankment. Outside of any testimony the existing conditions would suggest the need of surveillance. Such a necessity is a well recog-

nized ground for including territory. [Parker v. Zeisler, 73 Mo. App. 537; New Orleans & N. W. R. R. Co. v. Vidalia, 117 La. 561; Forbes v. Meridian, 86 Miss. 243; Catterlin v. Frankfort, 87 Ind. 45; Paul v. Walkerton, 150 Ind. 565; Langworthy v. Dubuque, 13 Iowa 86.]

"The case of Lake Erie & W. R. R. Co. v. Alexandria, 153 Ind. 521, was a case where police protection was required because of men frequenting a railway yard.

"The territory south of the Kansas City Southern embankment includes approximately one-third of the added land in the East Bottoms or something over one thousand acres according to one estimate, and about eight hundred acres according to another. Thus over 12,000 acres of the added 18,872 are accounted for and their inclusion justified. The remaining 6800 acres are largely located in the Blue Valley (3000 to 4000 acres) and the East Bottoms north of the Kansas City Southern embankment (about 2400 acres).

"The grounds urged by respondent to justify including the Blue Valley and this part of the East Bottoms are that there is need of this land for the future industrial growth of the city; that the land has, beyond its present uses, a much enhanced value because of its adaptability for industrial plants and railway usages; that there is need of police protection for the good both of the city and of the included territory; that there is need of sanitary protection both for the city and the land, and that the land is needed for its own protection by sewers or for use in constructing a sewer system for the city. As to this part of the East Bottoms, the sewer and sanitary arguments have no weight, as no menacingly unsanitary conditions exist there, and the land neither needs a sewer system itself at this time nor is it necessary that the city should now include it in the sewer system of the city.

The police protection argument also has little force for there are scarcely any people living on this land and no necessity for police protection requiring the inclusion of this large body of land has been shown. The police, sanitary and sewer arguments in reference to the Blue Valley have already been considered. While those considerations are of more force in the case of the Blue Valley than in that of the East Bottoms, they are not of sufficient importance to be decisive.

"On the point that this land is needed for the industrial development of the city the law seems clear that land beyond the immediate city needs may be included to provide for future growth and development. [Bradshaw v. Omaha, 1 Neb. 16; Ferguson v. Snohomish, 8 Wash. 668; Merritt v. State ex rel., 42 Tex. Civ. App. 495; State ex rel. v. Merchant, 85 S. W. 483 (Tex. 1905); Yancy v. Fairview, 66 S. W. 636 (Ky. 1902); Catterlin v. Frankfort, 87 Ind. 45.]

"None of the decisions define what is meant by 'growth' or how far into the future the city may look. The life of the city—the characteristics which distinguish it from a rural population—is its industrial establishments. Clearly then, if the city can provide for its growth at all it can do so in connection with its industries. It would be difficult, if not impossible, to state even a general rule which would be useful in determining how far into the future a city may look in laying down the boundaries for its development. The size of the city, the character of its surroundings and its industries; the rate of its progress and many other considerations might properly enter into the equation and be of different values in every case as it arose. On one hand it may be said that limit extensions are, and should be, infrequent, and therefore the city should be permitted to look ahead and provide for the development of several years at least. On the other hand, the city should not be permitted to reach out and subject lands which are not

clothed with any city uses to city burdens long before the city gives in return any substantial benefit. It has seemed to me that the fairest way to test such a proposition is to take the combined opinions of those in the city and of the owners of the land, as voiced in the value of the land. If land near a city is being held for prices far above any rural use and men in that city are willing to pay for it prices far in excess of any rural use, that land is as fairly within the future development of the city as the judgment of those who are most interested can place it.

"But aside from this test, which will be hereinafter applied in another connection, what was the need of land for the industrial growth of Kansas City? The facts found show that little really cheap factory land was within the old limits and that cheap land is always a consideration in the location of industries —especially of the larger and of the smaller kinds. The West Bottoms and the Belt Line are as effectually closed by high prices to a great many desirable industries as though they did not exist. The Blue Valley land, within the old limits and not subject to overflow, is filling up rapidly and prices are rising. Flood and litigation have effectually barred the greater part of the East Bottoms within the old limits. Locations within city limits are desired by most industries. The East Bottoms (with flood protection) and the Blue Valley are ideally located and situated, have good railway facilities and are the natural sites of Kansas City's industrial growth.

"It may be said that too much land for industrial growth was taken. There may well be a difference of opinion upon that point, but the rule as declared in McCleskey v. State ex rel., 23 S. W. 518 (Tex. 1893), is that the inclusion becomes unreasonable only 'if the excess be such as, in effect, to evidence an attempted fraud upon the law.' The last extension of the limits of Kansas City was twelve years ago. When one wit-

ness testified to locating forty industries in the Blue Valley within the past five years, and all agree that the general growth of the city is rapid, how can we say that this extension is so excessive as to suggest an attempted fraud upon the law which requires such extension to be reasonable? Another consideration in this connection affecting the East Bottoms is that to make that territory useful for industrial or any purpose it must be protected from the river. A glance at the map will show that any general plan contemplating river protection for any considerable portion of the East Bottoms must rationally and economically comprehend the entire Bottoms.

"Nor does the fact that the land is subject to overflow have any bearing upon the question, for, as said in Ford v. North Des Moines, 80 Iowa 626, in discussing a similar objection: 'If it is a valid objection, then, whenever a city or town is located on both sides of a river, the bottom lands should not be included in the municipality, because the land may be subject to overflow. There was no unreasonable or even improper extension of the limits of the town. This is apparent from subsequent events  . . . .  The appellants have no more right to exemption from municipal taxes and assessments than property owners in East Des Moines had before the bottom land from Capitol Hill to the river was reclaimed from overflow.'

"In speaking of an objection to the inclusion within the city limits of a tract of vacant low land, flat and wet and covered with timber, the court in the famous case of Vestal v. Little Rock, 54 Ark. 321, said: 'It may have been needed for town purposes, and it may have needed organized local government to reclaim the low, wet parts, and fit it for town uses. Such places are thus reclaimed in the ordinary course of town improvements, and become centers of population and business activity.'

"Also see New Orleans & N. W. Rd. Co. v. Vidalia, 117 La. 561; Merritt v. State ex rel., 42 Tex. Civ. App. 495; State ex rel. v. Merchant, 85 S. W. 483 (Tex. 1905).

"The final reason for inclusion urged by respondent is that the included lands of the entire district were adapted to some city usage—residential or industrial—and had values far above any purely rural employment.

"The mere fact that land near a city is worth more than it would be if away from the city is of no importance. Farming, gardening and dairy land is more valuable if near its market—the city. The value which comes from mere proximity of agricultural or pasture land to a city is not taken account of. [Courtney v. Louisville, 12 Bush 419 (Ky. 1876).]

"But if beyond and above this mere 'proximity value' of agricultural or pasture land, the land has a value which is far in excess of that of any agricultural or pasture land no matter how favorably situated, then the land has lost its character as country land. The city has given it a position which the city gives solely to its own. It has become valuable as city property and as such property it must share the burdens of the city.

"The rule as laid down in the leading case of Vestal v. Little Rock, 54 Ark. 321, is that lands may be annexed 'when they are valuable by reason of their adaptability for prospective town uses; but the mere fact that their value is enhanced by reason of their nearness to the corporation would not give ground for their annexation, if it did not appear that such value was enhanced on account of their adaptability to town use. We conclude, further, that city limits should not be so extended as to take in contiguous lands, (1) when they are used only for purposes of agriculture or horticulture, and are valuable on account of such use; (2) when they are vacant and

do not derive special value from their adaptability for city uses.'

"In Vogel v. Little Rock, 55 Ark. 609, the court said: 'The last contention is that the judgment is wrong because it brings within the city two hundred and forty acres of lands of Ratcliffe and others. The court might have found from the testimony of Ratcliffe and the agreed state of facts that a part of this land represented the city's growth outside of its limits, and, from the testimony of Adams, that all the land derived its value from actual or prospective use for town purposes. Upon such finding of facts, the court might have concluded, under the rule established in Vestal's Case, that it was right and proper to annex it. Nor does it matter that a considerable part of the land is at present used for agriculture; as its value is derived from its prospective town use, and not from its present country use, it might be properly included within the city. This is not the case where the value of the use of lands for agriculture is enhanced by proximity to town, but where the enhancement arises from prospective town uses. Adams's testimony is corroborated by the agreed statement that the land is worth $300 and upwards per acre, and that the improvements of the town have extended to and in fact penetrated or spread over the land.'

"In Woodruff v. Eureka Springs, 55 Ark. 618, the court said: 'We think the court was warranted in finding that it was right and proper to annex the lands ordered to be annexed, under the rules established by this court in Vestal v. Little Rock, 54 Ark. 321. It appears to have had but little value for country uses, and to have had great value for prospective city uses, and was therefore proper for annexation.'

"Also see Brooks v. Polk Co., 52 Iowa 460; Kelly v. Pittsburg, 85 Pa. St. 170; Borough of Duquesne, 147 Pa. St. 58; City of Jackson v. Whiting, 84 Miss.

163; Paul v. Walkerton, 150 Ind. 565; McCoy v. Trustees of Cloverdale, 31 Ind. App. 331; Durant v. Kauffman, 34 Iowa 199; Abbott's Munic. Corp., sec. 36. *Contra*, Ewing v. State ex rel., 81 Tex. 172.

"The language quoted from the Vestal Case fits the facts of the case at bar as though spoken concerning them. Some of the land here (in the Blue Valley) is now being used for agriculture, gardening and dairying purposes, some (practically the entire East Bottoms and some of the Blue Valley, including the Vineyard tract) is vacant. There is not an acre of it which is not properly valued at much more than it is worth for any country usage to which it is or could be put. Land which rents at twelve dollars per acre for the year is held at $350 and estimated to be worth from $450 to $1000 an acre. Scarcely an acre in the Blue Valley is worth less than $300, while much of it is worth nearer $1000 an acre, and some has sold for even more. In the East Bottoms the owners are deriving no income at all from over 1500 acres, yet that land is valued in its present unprotected condition, when its value is merely a potentiality, at hundreds of dollars an acre, and we find one of the owners buying similar ground nearer the river and paying therefor from $100 to $175 an acre. Such values are not sand bar values, nor even prospective agricultural or gardening values. They are city values based upon the prospective use of that land for city purposes and its adaptability for such uses. Such lands fall directly within the rule of the Vestal Case, which has been expressly adopted by the appellate courts of this State.

"There is another reason why much of this land should be included. If land contiguous to a city is being held by its owner to be brought on the market and sold as town property when such land reaches a value corresponding with the owner's ideas, it is city property and can be included.

"In the Vestal Case the second ground for annexing lands was: 'Whether platted or not, if they are held to be brought on the market and sold as town property when they reach a value corresponding with the views of the owner.'

"In Durant v. Kauffman, 34 Iowa 199, where the question (under the Iowa rule) was whether alleged agricultural land included within the city limits should bear municipal taxes, the court said: 'In determining the benefits accruing to such lands, a controlling fact to be considered is the purpose for which they are held. If held as city property, to be brought upon the market as such, whenever they reach a value corresponding with the views of the owner, they ought to be taxed as other city property. There would neither be reason nor justice in permitting a proprietor of a large tract of land within a city to hold it for an opportunity to bring it into the market as city lots, and for no other purpose, under the pretense that it is agriculural lands, thus escaping taxation for the general improvement of the city, the very thing which will bring his lands into the market, and thus add greatly to their value—a direct benefit to the owner.'

"Practically all the Blue Valley land is being so held. While the East Bottoms land in its present condition is scarcely marketable for its ultimate use, yet its owners can have but one object in holding it at all—to dispose of it as city property.

"Regarding some of the Blue Valley land, there is another reason mentioned in some of the decisions. Those owners of Blue Valley land who use it for gardening, agriculture or dairy purposes drive into Kansas City and dispose of their products in that market.

"In Windfall Mfg. Co. v. Emery, 142 Ind. 456, in discussing the grounds alleged for annexation, the court said: 'It was proper, under the issues in this case, to give evidence concerning the location of ap-

pellant's factory with reference to the corporate limits of the town; its size and capacity; where its office was kept—whether in town or at the factory; whether the town was a market for any part of its products; and to what extent, if any, the appellant and its customers used the streets of the town in the delivery of its products and in the transaction of its business.'

"As to the East Bottoms, this additional reason may be cited. An inspection of the map will show that the old limits of Kansas City, starting from the Missouri River on the north and west and extending to the low ground near the mouth of the Blue River, within a short distance of the Missouri River on the south and east, almost completely surround this property on the land side. While a slight opening is left, yet it is in the low ground at the Blue's mouth. This condition might make applicable the cases which hold that if the land included is so situated that it cannot be reached except over the streets of the city it may be included. [Borough of Duquesne, 147 Pa. St. 58; McCoy v. Trustees of Cloverdale, 31 Ind. App. 331.]

"The contention of relator that the extension of the city limits over some of the added territory deprives the owners of that territory of their property in violation of the Federal and State Constitutions, is not well taken for two reasons. First, this is a proceeding by the Attorney-General in his official capacity. The only concern of the State is that the municipal corporation act within the law in extending its limits. It will not permit its creatures to act outside the laws of their being. It has no concern in the losses of any private individual. Any such individual has his ample remedy in the statute. Second, the only taking of property possible under this annexation would be for city taxes, either special or general. Special taxes are, in the law's eyes, for direct benefits. City taxes for general purposes do not con-

stitute a violation of those constitutional provisions, as was directly decided in Kelly v. Pittsburg, 104 U. S. 78.

"When the Kelly Case was before the Supreme Court of Pennsylvania (85 Pa. St. 170) the court quoted with approval from the referee's report as follows.: 'Mr. Kelly's land was, up to consolidation, in close proximity to the city. Its value therefore depended on the growth and prosperity of the city. As the city grew and prospered the value of this land increased until it became very great. It was then brought into the city and made a part of it, but its value still continued to depend upon the growth and prosperity of the city. To arrest the prosperity of the city would be to seriously affect the value of the land; to destroy that prosperity would be to destroy to a great extent that value. The prosperity of the city depends on its streets being kept in repair, and its water and gas and educational facilities being ample. Without these it would fall into decay, and the value of all the real estate in it, including Mr. Kelly's, would be incalculably reduced. The city cannot keep the streets in repair, and furnish an adequate supply of water and gas and educational facilities, without money, and the only way it can raise money for those purposes is by taxation. It seems to me, therefore, that the idea that Mr. Kelly is not interested in the objects to which the taxes are to be applied, and that he receives no benefits in return for the taxes, is a mistaken one, even if he received no special benefits from the application of the taxes; and the idea that taxing unproductive property according to its market value is confiscating it, or taking it for public use without compensation, I think is equally a mistaken one.'

"In conclusion I find for the respondent upon the issues of the case and recommend that judgment be entered in its favor and relator's bill be dismissed."

In confirmation of the foregoing we make the following general observations:

It must be admitted that a first impression, upon learning of the large extent of territory sought to be added to the city by the charter amendment before us, is that of doubt as to the reasonableness of the action of the city in attempting to bring about that result. And if we were considering the question with reference to a city which had required a century or more to reach the present high rank of respondent, in population and commercial importance, a city which gave indications of having reached the culmination of its growth, it would be difficult, under the law as applied in such cases, to justify the bringing within the limits of the city such a large area of contiguous lands. But we must approach the determination of this question, giving due appreciation to the fact that we are passing upon the right of a city to expand in territorial extent, which in half a century has advanced from a small village to a metropolis of a quarter of a million people, and which has become one of the great commercial centers of the world. In the last decade it has increased its population at an average of between eight and ten thousand persons a year, its increase in industrial and business activities keeping pace the while, or rather, accounting for its phenomenal growth in population. As a promise of its future we recognize the fact that it is situated in the heart of a most fertile and productive region rapidly becoming densely populated; that great railway systems, having their terminals there, radiate into the surrounding territory and make of this city one of the most important traffic centers of this country. Neither can we leave out of consideration, in contemplating the future needs of respondent, the present re-awakening interest in the restoration of traffic and navigation upon the Missouri River, along which a large part of the territory annexed by the charter amendment has frontage.

It is not our purpose again to review the evidence
of this case, nor to discuss the several grounds upon
which the respondent seeks to justify the reasonable-
ness of its action.  We have called attention to these
general conditions and surroundings in order to show
that the reasonableness of the territorial expansion
of respondent should not be approached with any nar-
row or restricted view of its needs, but that it should
be considered broadly and in a manner commensurate
with respondent's history, its present necessities and
promise of future greatness.

Coming now directly to the question in hand, we
have these few suggestions to make. supplementary to
what has been so well said by the commissioner.  The
one important, controlling and dominant fact which
has been proven beyond question by the evidence be-
fore us, is that all the lands annexed, whether in
the "Southern Territory," the "Blue Valley" or the
"East Bottoms," have a largely increased value by
reason of, and solely by reason of, their adaptability
to present or prospective city uses.  No possible ex-
planation on the theory of the prospective tillage of
these lands can account for their present high values.

The testimony, photographic exhibits and plats
show that, scattered through the "Southern Territory"
and "Blue Valley," additions have been laid out and
platted; streets and boulevards have been laid out,
graded and constructed; electric railways have been
built and are being operated; residences have been
built and are now occupied as homes; industries have
been established; and whether the extension of the
city limits shall stand or fall, this territory in reality
and to all intents and purposes is now and will con-
tinue to be used and dealt in as city property.

It would indeed be a short-sighted policy which
would preclude the city from bringing within its
limits, exercising control over and giving direction to,
the building of what must inevitably soon become a

part of the municipality. And that is not the policy of the law, for, as heretofore shown, one of the recognized rules of the right of the city to annex contiguous lands, as laid down by this and other courts, is that such lands may be added "when they are valuable by reason of their adaptability for town uses." Tested by this rule, there can be no doubt as to the reasonableness of the charter amendment in bringing within the city limits the "Southern Territory" and the "Blue Valley."

The tract of land called the "East Bottoms," consisting of between three thousand and four thousand acres, as shown by the evidence, is now practically uninhabited and unused. But this level tract of land, skirting the city on the north, lies between the river front on one side and the terminals of four great railway systems on the other. And here again we are confronted with the fact that this waste and unused land is worth from three hundred to a thousand dollars an acre, and if protected against the flood waters of the river, its value would be greatly increased. What gives to these unproductive lands such remarkable values? Is it because of their prospective use for tillage or for city purposes? If the latter, then, under the settled law, the city has a clear right to include them within its limits and for that reason alone. If the former, then why have they not been reclaimed under existing levee and drainage laws, when lands far from a city and worth from ten to twenty dollars per acre, throughout the State, are being so reclaimed? It is not a satisfactory answer to the inquiry as to the high value of this land to say, as said by relator in the information, "That the said tract of land is valuable for the production of cottonwood and willows."

The high values placed upon this unused land, as a result of the judgment of the investing public, is the most satisfactory evidence which could be sub-

mitted, as to its prospective use for city purposes. Will land worth from three hundred to a thousand dollars an acre ever be reclaimed from the effects of water for agricultural purposes? That it is practicable to protect it from the overflow waters is shown by the evidence. That it will be so protected, we do not entertain a doubt. It is not probable that this will be done by private enterprise, but under the authority and direction of the city. And when this land, now covered with willows, shall be protected against the ravages of the river, it is not a rash prediction that, at a time not far distant, it will become the commercial front of this great city.

After a careful reading of the testimony reported by the commissioner, and an examination of the law applicable thereto, we are of the opinion that the report of the commissioner, finding for the respondent upon the issues of law and fact, is fully supported by the record.

The report of the commissioner is therefore confirmed, and the writ of ouster denied. *Lamm, Ferriss* and *Brown, JJ.*, concur; *Graves* and *Woodson, JJ.*, dissent; *Valliant, C. J.*, absent.