McDONNELL AIRCRAFT CORPORATION, Plaintiff-Respondent,

v.

CITY OF BERKELEY, a Municipal Corporation, Defendant-Appellant.

CITY OF ST. LOUIS, a Municipal Corporation, et al., Plaintiffs-Respondents,

v.

CITY OF BERKELEY, a Municipal Corporation, Defendant-Appellant.

Nos. 48634, 48635.

Supreme Court of Missouri,

Division No. 1.

May 13, 1963.

Boyle, Priest, Elliott & Weakley, Howard Elliott, Edward D. Weakley, Howard Elliott, Jr., St. Louis, for appellant, City of Berkeley.

Thomas J. Neenan, Thomas F. McGuire, Aubrey B. Hamilton, St. Louis, for City of St. Louis.

Samuel H. Liberman, St. Louis, Attorney for American Airlines and others.

Thomas S. McPheeters, Jr., Marion S. Francis, St. Louis, Attorneys for McDonnell Aircraft Corp.; Lewis, Rice, Tucker, Allen & Chubb, Bryan, Cave, McPheeters, & McRoberts, St. Louis, of counsel.

HYDE, Judge.

Actions for declaratory judgment and injunction, consolidated for trial, to declare void proceedings of the City of Berkeley to annex Lambert-St. Louis Municipal Airport, owned by the City of St. Louis, and adjoining land of McDonnell Aircraft Corporation, northwest of the airport. Seven Airlines using the airport joined as plaintiffs with St. Louis. The court entered judgments declaring void the amendment to the charter of Berkeley extending its corporate limits and enjoining Berkeley from exercising any jurisdiction over the area. Berkeley has appealed from these judgments.

All parties say we have jurisdiction on the ground the construction of the Constitution of this state is involved (Sec. 3, Art. V, V.A.M.S.; constitutional references are to 1945 Constitution unless otherwise stated) but have different views as to the provisions to be construed. Berkeley claims that because it has adopted a charter for its own government, under Sec. 19, Art. VI, it has constitutionally vested legislative power, under Sec. 20, Art. VI, to extend its boundaries by charter amendment and that such action is not subject to judicial review. Thus its claim is that no court can judicially review charter amendments for annexation of territory by a constitutional charter city. This question was noted in State ex inf. Major v. Kansas City, 233 Mo. 162, 192, 134 S.W. 1007, 1015, as follows:

"In its brief in this court respondent has, for the first time, challenged the right of the court to pass upon the reasonableness of its action in amending its charter, for the reason that in so doing the qualified voters of Kansas City were acting under authority directly conferred by the Constitution of this state, and therefore were engaged in a legislative act not subject to judicial review. This question we regard as different from that of the unreasonableness or oppressiveness of an ordinance or resolution enacted by the lawmaking body of a city in the exercise of a delegated legislative power. In the latter case the right of judicial review is recognized law. This contention of respondent is not without support, but the question was not raised by striking at the information, or by the answer and return, or by exception to the finding of the commissioner against respondent upon that issue, and therefore it is not properly in the record for decision." Berkeley did raise this question, at the time the petitions were filed, by motions to vacate the temporary restraining order then issued and thereafter in its answers.

■ The Major case was decided in favor of the City on all issues raised, including the issue of reasonableness, so that failure to decide the question of constitutional authority made no difference in the result. The argument for Berkeley's claim is that a constitutional charter city has the same authority in establishing and extending its area that the Legislature had when it fixed or extended boundaries of cities in granting and amending charters. See Giboney v. City of Cape Girardeau, 58 Mo. 141, 142, and cases cited. Thus we must determine the meaning and effect of Secs. 19 and 20 of Art. VI. The other parties claim there is involved the effect of Sec. 18, Art. VI, authorizing counties to adopt charters, on Secs. 19 and 20, saying it must be determined whether the legislative power, vested in a charter county by Sec. 18(c) "pertaining to public health, police and traffic, building construction, and planning and zoning" may be ousted by action of a charter city. They say this was not settled by City of Olivette v. Graeler, Mo.Sup., 338 S.W.2d 827, because "it did not involve a constitutional charter city or the question of conflicting constitutional provisions," and because there was no "point raised in that case that the territory within which a charter county exercises its municipal functions cannot be annexed by a city in a unilateral proceeding." They also, citing Chambers v. City of St. Louis, 29 Mo. 543, 575, Dysart v. City of St. Louis, 321 Mo. 514, 11 S.W.2d 1045, 62 A.L.R. 762, and Sec. 305.190 RSMo, V.A.M.S., say St. Louis is exercising governmental functions in operating the airport which Berkeley cannot be permitted to disturb. Since at least the construction of Secs. 19 and 20 of Art. VI is required (and their effect on other constitutional provisions) our conclusion is that we have jurisdiction of these appeals.

■ Since plaintiffs allege that the annexation is arbitrary, unreasonable, unjust and oppressive and in effect works a fraud on their rights, and was declared by the court to be unreasonable, oppressive, illegal and void, it is necessary first to decide the constitutional question raised; that is whether any annexation by a charter city is subject to judicial review. It is well settled that the method by which a charter city may annex territory is by charter amendment. City of Westport v. Kansas City, 103 Mo. 141, 15 S.W. 68; Kansas City v. Stegmiller, 151 Mo. 189, 52 S.W. 723; State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762. The Taylor case, as did the Major case, considered the reasonableness of the annexation by a constitutional charter city and decided that issue in favor of the City. In considering this matter, it must be recognized that under our present constitution, even the legislature no longer has the authority it had at the time of the Giboney decision (58 Mo. 141) to incorporate cities and change their charters, this being prohibited by Sec. 40(22), Art. III. Sec. 15,

Art. VI, now requires general laws authorizing such action. Can a constitutional charter city now do, without consideration of its effect on others, something the legislature cannot do? Our view is that it cannot do so. Moreover, even as to Acts of Congress, the United States Supreme Court has said: "We may inquire whether its action is arbitrary or capricious, that is, whether it has reasonable relation to a legitimate end. If it is an appropriate means to such an end, the decisions of the Congress as to the degree of the necessity for the adoption of that means, is final." Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885. It is also well established that the test of validity of exercise of the police power is reasonableness. 11 Am.Jur., Constitutional Law, Secs. 302–309; 16 C.J.S. Constitutional Law, § 198. An arbitrary, unjust, unreasonable and unnecessary annexation was considered a taking without due process in State ex rel. Bibb v. City of Reno, 64 Nev. 127, 178 P.2d 366. It was there contended that under a special charter granted by the legislature "that the city has an absolute power to annex"; but the court, giving extreme examples of what such absolute power could lead to, held "[a]n annexation which is arbitrary, unreasonable, unjust and unnecessary will be held invalid." In State ex rel. Davis v. Stuart, 97 Fla. 69, 120 So. 335, 64 A.L.R. 1307, the boundaries of a city were extended by Acts of the state legislature to increase its size from 640 acres to 9460 acres mainly rural lands. It was held these Acts "would appear to contravene those provisions of our Declaration of Rights protecting the rights of private property such as those which prohibit the taking of private property without just compensation and guarantee the equal protection of the laws and the right to acquire, possess, and protect private property." A similar case in this state as to area affected is Nolting v. City of Overland, 354 Mo. 960, 192 S.W.2d 863, in which we held the annexation invalid because unreasonable, unjust and oppressive. (For cases from other states see Annotation, 64 A.L.R. 1335; see also 16A C.J.S. Constitutional Law § 604c, p. 726.)

It is not necessary to go as far as the Florida and Nevada cases because we cannot sustain the claim of Berkeley that Secs. 19–20, Art. VI, give to cities organized under it the full authority originally possessed by state legislature under our original constitution of 1820. In Kansas City v. J. I. Case Threshing Machine Co., 337 Mo. 913, 87 S.W.2d 195, we considered the home rule charter provisions of our 1875 Constitution (Secs. 16–17, Art. IX as amended in 1920) holding that "a municipal corporation has no powers which are not derived from and subordinate to the state" and that a charter city's powers "must come from either a constitutional or legislative grant." (87 S.W.2d 1.c. 198.) We also said the constitutional grant "did not make the people of such cities independent of the Legislature in all matters and delegate to them legislative authority to decide all policies concerning the affairs of government to be carried on in their areas." As to this, we quoted with approval the following statement from 19 R.C.L. 749: "One state cannot without the consent of the other states divide itself up into a number of independent sovereignties, and consequently a municipal corporation cannot be made a free city wholly immune from legislative control. It is an essential element of all constitutional provisions establishing the principle of municipal home rule that the constitution and general laws of the state shall continue in force within the municipalities which have framed their own charters, and that *the power of the municipality to legislate shall be confined to municipal affairs.* On the other hand, after the adoption of a home rule charter by a municipal corporation, *the Legislature cannot, even by a general law, affect the powers of the municipality with respect to matters of municipal and local concern.*" (87 S.W.2d 1.c. 200.) After reviewing our decisions, our conclusion was thus stated (87 S.W.2d 1.c. 202): "It, therefore, seems that the principle upon which the decisions may be harmonized is

that as to its form of organization and as to its private, local corporate functions, and the manner of exercising them, the constitutional provision grants to the people of the cities designated part of the legislative power of the state for the purpose of determining such matters and incorporating them in their charter as they see fit, free from the control of the General Assembly. When matters of this nature are adopted in a charter, as prescribed by a Constitution, such charter provisions have the force and effect of a statute of the Legislature and can only be declared invalid for the same reason, namely, if they violate constitutional limitations or prohibitions. Kansas City v. Marsh Oil Co., 140 Mo. 458, 41 S.W. 943. On the other hand, in matters which are governmental functions, the state retains control and, as to such matters, the provisions of a city charter, although adopted under the constitutional provision therefor, must be and remain consistent with and subject to the statutes of the state enacted by the Legislature. Ewing v. Hoblitzelle, 85 Mo. 64, loc. cit. 76."

Certainly bringing additional territory into cities without the consent of the inhabitants and owners of property therein is an important governmental function in which the whole state has an interest. This is more than a matter of only municipal affairs and as noted our Constitution limits the legislature to providing for this by general laws. The policy of the state in this respect as to all cities is stated in Sec. 71.015 (statutory references are to RSMo and V.A.M.S.) in the requirement "[t]hat such action is reasonable and necessary to the proper development" of the city. Although we have held that a constitutional charter city is not required to follow the procedure stated in this statute because the Constitution provides different procedure for such cities (McConnell v. Kansas City, Mo.Sup., 282 S.W.2d 518), nevertheless this states the legislature's standards. Furthermore as to annexations by charter cities including another city, town or village, the legislature by Sec. 82.090 has required a

favorable vote of four-sevenths of the voters thereof as well as a majority vote of the charter city. Berkeley recognized legislative authority to make this limitation by voiding a previous attempt to extend its boundaries which included parts of Edmundson and Hazelwood.

It is difficult to see how, under the limitations of our present constitution, the authority of constitutional charter cities to annex territory by charter amendment is any broader than the statutory authority given other cities. (See Sec. 79.020, Cities of Fourth Class; Sec. 77.020, Cities of Third Class; Sec. 75.020, Cities of Second Class; all of which only provide as the test that annexation "in their judgment and discretion may redound to the benefit of the city." As to Cities of First Class by Sec. 73.110(43) the authority is given for annexation by ordinance, without requiring approval of the voters as in the other three classes, and only with the restriction that is "not inconsistent with the constitution or any laws of this state" or of chapter 73.) In City of St. Joseph v. Hankinson, Mo. Sup., 312 S.W.2d 4, 8, we pointed out that, in reviewing the validity of annexation cases "it has been the universal rule that the court does not, in any sense, substitute its discretion or judgment as to the advisability or propriety of the annexation for that of the legislative body of the city, and that it does not review the legislative discretion; its consideration of 'reasonableness' is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one; if there is such, then the discretion of the legislative body is conclusive." We therein further stated: "The function of our courts, historically, has been merely to determine, in the light of these principles, whether the exercise of the legislative powers has been arbitrary and clearly unreasonable. (See the cases just cited.) Only to this extent do our courts consider the reasonableness of an annexation." (For discussion of the test of a fairly debatable question see State ex inf. Mallett ex rel.

Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 398; City of Sugar Creek v. Standard Oil Co., 8 Cir., 163 F.2d 320; see also Hixson v. Kansas City, 361 Mo. 1211, 239 S.W.2d 341, 346.) The United States Supreme Court has applied the fairly debatable test to zoning. Zahn v. Board of Public Works of the City of Los Angeles, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074. One of our earliest cases, stating a city's authority to annex "must be exercised within the bounds of reason and apparent necessity," is Kelly v. Meeks, 87 Mo. 396, 404. See also Copeland v. City of St. Joseph, 126 Mo. 417, 432, 29 S.W. 281, relying on Vestal v. Little Rock, 54 Ark. 321, 15 S.W. 891, 16 S.W. 291, 11 L.R.A. 778. As we stated in City of Olivette v. Graeler, Mo.Sup., 338 S.W.2d 1. c. 836: "The reasonableness of an annexation by a city has always been held to be a subject of judicial inquiry largely because the inhabitants of the adjacent territory have no part in the selection of the city officers who initiate the annexation proceeding nor a vote in the city election by which it is confirmed." Therefore, our conclusion is that annexation of additional territory is a matter of more than merely municipal affairs and concern and that the reasons for applying the test of unreasonableness amounting to arbitrary, capricious action and abuse of discretion are equally applicable to annexations by constitutional charter cities and those organized under general statutes.

As to the claim of plaintiffs concerning conflict between Sec. 18 and Secs. 19 and 20, Art. VI, we note that St. Louis County is not a party hereto claiming any interference with its rights or authority. In any event, we see no reason for refusing to apply to annexation by a constitutional charter city our rulings in the Graeler case, 338 S.W.2d 1. c. 836, that "[d]espite its corporate form of organization and all its permissive functions of a municipal nature, St. Louis County is not, as a matter of law, tantamount to an incorporated city"; but that "the fact that municipal services are being rendered in the area sought to be annexed

should be considered and weighed along with the other evidence in the case in determining the reasonableness of the annexation." The claim of St. Louis of interference with its operation of the airport seems not to be based on any constitutional provisions (none are cited) but rather on statutory authority and provisions of its charter. This claim will be considered in ruling the issue of whether the annexation was arbitrary, capricious, unreasonable and an abuse of legislative discretion.

Since this case was tried without a jury, in accordance with Rule 73.01, V.A.M.R., evidence was preserved which the trial court considered inadmissible and we will consider such part thereof as we believe to be admissible and disregard any evidence we consider inadmissible.

The airport at the present site was first a private enterprise beginning about 1915. In 1927 a St. Louis airport commission was appointed and January 14, 1928, an ordinance was enacted authorizing the purchase and leasing of land in St. Louis County for a Municipal Airport. An ordinance authorizing issuance of two million dollars of bonds for development of the airport was approved that year by the voters of St. Louis. The validity of these bonds was upheld by this court December 6, 1928. Dysart v. City of St. Louis, 321 Mo. 514, 11 S.W.2d 1045. In 1929 the Missouri General Assembly enacted statutes (Laws 1929, p. 276), now Secs. 305.170–305.230, authorizing cities to acquire, own and operate airports with broad authority including eminent domain. Berkeley was incorporated July 31, 1937, as a city of the fourth class, located to the east of the airport area. An ordinance of March 18, 1938, approved by the voters provided for annexation of 1300 acres west of the City, including the airport, then with an area of about 540 acres, the rest being devoted to agriculture and horticulture according to the findings of the Circuit Court of St. Louis County in a suit brought by landowners to declare void and enjoin the annexation. The Court's decree entered in 1940 held the attempted annexation void

as "unconscionable, oppressive, unreasonable and unjust." An appeal taken by Berkeley was dismissed February 26, 1941. The 1940 census showed the population of Berkeley as 2577. In 1950 it was 5268 and in 1960, 18,676. After the dismissal of the appeal in 1941, a new annexation of the area was approved by the voters of Berkeley and a new suit was filed by the same landowners to have it declared void and enjoined. St. Louis filed an intervening petition in this suit but it was never tried and was dismissed in 1944 after the Berkeley voters approved an ordinance for diminution of the city limits excluding the annexation area. It is said in Berkeley's brief this (referred to as a "rollback" of boundaries) was done "at the request of the Federal Government in aid of national defense." It appears that Berkeley collected taxes on some property in the area between 1941 and 1944.

Berkeley's next attempt at annexation of this territory including the airport was in 1953, approved by the voters on November 3, 1953. Berkeley had testimony that this action was requested by the then City Counselor of St. Louis as a remedy for criminal and unsanitary conditions at the airport. Nevertheless, this annexation attempt was declared void, in an action brought by St. Louis, because of failure to follow the procedure provided by Sec. 71.015. Thereafter on February 26, 1954, Berkeley filed a suit for declaratory judgment pursuant to this statute seeking to have the airport area declared necessary to its development but this was never tried and was dismissed without prejudice on December 15, 1958. In the meantime, in April 1957, Berkeley adopted a charter as authorized by Sec. 19, Art. VI, 1945 Constitution. Thereafter, on April 1, 1958, it adopted a charter amendment extending its boundaries to include the airport area. After suits were brought by St. Louis and McDonnell, it was found that the area described in the charter amendment included parts of the Villages of Edmundson and Hazelwood without complying with Sec. 82.090; and on December 15, 1958, a decree was entered in these suits declaring that annexation void. The annexation sought to be declared void in the present suits was based on a charter amendment approved by the Berkeley voters April 7, 1959.

In 1943 the territory surrounding the airport was mostly vacant ground devoted to farming. The airport was greatly expanded during the period of World War II to about 1400 acres and much of it was used by the U. S. Army and Navy and for aircraft production. A large plant built during the war by the Defense Plant Corporation became the property of St. Louis and was sold to McDonnell. At the time of the trial St. Louis had invested $21,000,000.00 in the airport and the U. S. about $4,000,000.00; additional bonds had been approved and with U. S. grants would be used for further improvements. The annual income of St. Louis from the airport was $1,500,000.00 and it was operated on a break-even basis. Its annual passenger traffic was 1,585,000 persons. The present area of Berkeley is 2985 acres (1242 acres zoned for industrial purposes). The area sought to be annexed is 1475 acres owned as follows: St. Louis 1282 acres, McDonnell 122 acres and the rest by United States, some of which is used by the Air National Guard and some leased to McDonnell. The eastern part of the airport does extend into Berkeley. This was said to be vacant ground held for clearance purposes, estimated to be about 100 acres. There is also airport land owned by St. Louis in other adjoining towns and runway extensions are planned. Berkeley boundaries are all boundaries of other municipalities except its western boundary with the airport. McDonnell recently has built three plant buildings in Berkeley near the eastern boundary of the airport, owning 142 acres in the western part of Berkeley. Other towns adjoining the airport, with 1960 population, are: Hazelwood, 6,045; Bridgeton, 7,280; St. Ann, 12,155; Edmundson, 1,428; Woodson Terrace, 6,048.

It would unduly lengthen this opinion to state in detail the evidence contained in the record herein of 28 volumes (7635 pages) and hundreds of exhibits. Therefore we

will summarize the evidence in several pertinent categories as the parties have done in their briefs. Berkeley's claim is that traffic, crime, fire hazards and sanitation have not been and will not be satisfactorily regulated and controlled unless it obtains full authority over the airport area by annexation.

*Traffic:* The whole area around the airport, especially in Hazelwood and Bridgeton north and west of the airport, is highly industrialized with the largest work force in the state. It is served by the Wabash Railroad (with tracks between the airport and Hazelwood) and several state highways including the recently completed Mark Twain Expressway of the federal interstate system. McDonnell had from 23,000 to 27,000 employees during 1958 and 1959 working in three daily shifts, 2350 of these worked in the Berkeley plants and the rest in the annexation area. The worst congestion was from 6:30 to 9:00 A.M. and from 3:30 to 6:00 P.M. Conferences were held between McDonnell's officers and Berkeley's officials which resulted in part-time use of Berkeley's police force and deputization of McDonnell's plant guards to control traffic. Much traffic to and from McDonnell's plants was on Brown Road through the western part of Berkeley. Congestion extended into residential areas of Berkeley and hindered operation of its police, fire and ambulance vehicles and travel of children to and from schools. Some Berkeley streets were improved to take care of traffic and widening of others planned. About 80 photographs were in evidence showing traffic conditions on the main roads at various hours. The St. Louis County police enforces traffic regulations on highways outside incorporated towns and the county has a traffic engineer engaged in planning to expedite traffic. McDonnell's plant guards have been deputized by the County Police Department and aid in traffic control. The St. Louis Airport watchmen are also deputized by the County and assist in traffic control. McDonnell had large parking lots for its employees. Starting and quitting times for McDonnell's employees have been varied both by building

location and type of employment to minimize traffic congestion. Charts in evidence showed traffic counts and origination and destination surveys. More than 800 of McDonnell's employees lived in Berkeley, the others come from other places in St. Louis County, from St. Charles County and from the City of St. Louis. Employees of the Ford Motor Company, International Harvester Company and other large employers in Hazelwood also travel the highways around the airport. There was testimony by a traffic expert of greater traffic congestion in other parts of the metropolitan area. Traffic to the Airport Terminal used Natural Bridge Road which was a four-lane state highway but the new Mark Twain Expressway now affords a better route through the area.

*Police Protection:* Berkeley's annexation election herein involved was in April 1959 and these actions were begun that month. Evidence of conditions goes back several years before the 1954 St. Louis County charter amendment establishing the St. Louis County Police Department with testimony concerning the "taxicab war" of 1952, when hoodlums trying to control taxicabs bumped them into each other; and concerning prostitution, fights, sale of obscene material, narcotic traffic, burglary, robbery and other crimes. There was also evidence of crime in the area in 1958 and 1959, particularly thievery from automobiles. The airport now receives the same benefits of the County Police Department as do all unincorporated areas and the Department's North District exchange point for patrols was on the airport. Shift changes occur there and reports written there so that some officers are usually at or close to the airport. However, the Superintendent of County Police said the department was at least 25% short in required manpower. In addition St. Louis has a contract with the County Police Department for regular assignment of three officers (paying their salaries) but they are not on duty from midnight to 6:00 A.M. St. Louis has an airport police force of ten men, who are civil service employees; nine of them having attended an

F.B.I. sponsored course at the County Police Academy. They are licensed watchmen under the County Police Department regulations and authorized to carry firearms but none of them are policemen. The 1958–59 fiscal year record of airport police activities showed 6 larceny cases, 13 motor vehicle accidents, 7 larcenies from automobiles, 2 larcenies of aircraft; 1 larceny of an automobile and 125 lost and found articles. County police records for the 1958 year showed for the whole annexation area: 2 robberies, 75 larcenies, 10 auto thefts, one forgery, one embezzlement, one disorderly conduct, one vagrancy, one violation of driving laws, one peace disturbance, one leaving scene of accident, one bomb threat, three interferences with interstate transportation, 12 auto accident reports and 63 non-criminal police services.

McDonnell has a Security Guard of 170 men, all licensed as watchmen by St. Louis County, operating in three shifts of 35 and 40, with 23 to 39 on duty on holidays. 77 had been deputized by St. Louis County, with 85 more applications pending; 30 had been deputized by Hazelwood for traffic control and some had been deputized by Berkeley but these deputizations had been cancelled just prior to these suits. McDonnell's force maintains close cooperation with the Federal Bureau of Investigation, Navy Department, United States Air Force, Secret Service of the Treasury Department, St. Louis County Police Department and the Missouri State Highway Patrol. All of McDonnell's work is for the U. S. and much of it is classified as very secret. McDonnell's guards are members of a local of the International Union of United Plant Guard Workers of America, working under a union contract and would be free to strike at its termination. The contract has no provision for prevention of wildcat strikes. Provisions have been made for replacement by other personnel in case of a strike. There is no radio communication outside the plants and when police are required they would be called by telephone. Likewise the airport

watchmen have no radio communications or patrol cars.

Berkeley has a full-time paid police force of 25 men, with 16 auxiliaries on call. The men (except the Chief who had 10 years' experience) had civil service status. New men received training at the State Highway Patrol Academy with continued training on the force and the County Police Academy. Their equipment consisted of three police cars, a motorcycle, an unmarked car and a jeep, with three-way radio and a 24-hour vehicular patrol was maintained. Berkeley had a transmitter for communications with its cars, St. Louis and St. Louis County Police Departments and the Missouri and Illinois Highway Patrols. Its equipment included firearms, tear gas equipment, projectiles, riot shells, fingerprint outfits, identification files, radar and speed watches and other modern police articles. The Berkeley Chief and his second in command knew of no specific criminal activity originating at the airport that affected Berkeley. Felonies in Berkeley are low in number. Berkeley has plans to increase by at least ten men its police force and add two patrol cars and other equipment if annexation is approved.

*Fire Protection*: Prior to February 1, 1958, air-crash fire protection at the airport was furnished by the U. S. Navy. At that time the Navy abandoned its facilities and St. Louis took over air-crash protection under the St. Louis Fire Department. The St. Louis Fire Department has a permanent unit of 27 men (23 firemen and 3 captains under a battalion chief) at the airport. It can have assistance from the whole St. Louis Fire Department, which has a large mobile reserve force. The firemen assigned to the airport unit are required to have at least five years' structural fire experience and also aircraft experience either as a pilot or in crash fire fighting. After assignment they receive training in crash fire fighting, rescue work, first aid, handling volatile fuels and metals, and knowledge of all types of aircraft. They are on duty on round-the-clock shift, stationed at a fully equipped fire

house on the airport with equipment for both structural and crash fire fighting. All their vehicles are radio equipped for communication with the control tower and with each other, and include crash fire vehicles, pumper and water vehicles with foam equipment. McDonnell also has a fire department of 38 men, 3 lieutenants and a chief with an auxiliary force of 662 men, with Navy furnished equipment of pumpers, crash trucks and chemical trucks. Close liaison is maintained between these two fire departments. The McDonnell firemen are trained in all phases of fire prevention and fire protection including crash fire fighting and rescue work and the McDonnell plants are protected by sprinkler systems. St. Louis had appropriated funds for adding to its crash fire equipment because of the advent of high passenger capacity jet aircraft.

Berkeley originally was protected by a volunteer fire department, at first in cooperation with the neighboring city of Florissant. It established a full-time paid fire department in 1955, which consisted of 13 firemen, four officers and a chief, working in two shifts, 24 hours on and 24 hours off. Its members were given in-service training and instruction at special school including crash fire, jet fuel and flammable liquid fire fighting and some had previous experience in such fire fighting and rescue work. Eleven auxiliary firemen and more than 300 volunteers were available. Equipment included foam type extinguishing agents for combatting aircraft crash fires, three structural pumpers and a chief's car, all equipped for radio communication between vehicles, dispatcher and other fire departments. Efficiency was shown by the fact that Berkeley's fire loss record was much less than the national average. Berkeley had mutual aid agreements with all other adjoining fire departments, with 19 fire houses in a six-mile radius having 22 pumpers available. The nearest St. Louis fire station was nine miles from the airport. There have been airplane crashes in Berkeley which required use of its fire department to extinguish these fires. Berkeley has a higher class rating from the Missouri Inspection Bureau than the annexation area. Berkeley has plans for a new fire station, seven additional vehicles, and the following additions to its force: 33 firemen, two lieutenants and two captains, to service the city and the airport. The movement of emergency vehicles on the airfield is controlled exclusively by the U. S. Government and taking over of protection by Berkeley would not affect that control.

*Sanitation, Health and Welfare*: Coldwater Creek flows through the proposed annexed area. It has been put underground through the airfield in closed concrete tunnels but is open near and inside Berkeley's boundaries. There were some septic and treatment tanks at the McDonnell plant and at the airport but there was conflicting evidence as to their efficiency and there was much untreated sewage discharged into the creek from various sources. The Metropolitan Sewer District has exclusive control of and responsibility for all sewers both at the airport and in Berkeley with full authority over them. St. Louis County Health Department serves the airport area and Berkeley (under contract) for many sanitation services, including restaurant inspection, water analysis, inspection of septic tanks and industrial hygiene. The Assistant Airport Manager testified that all trash and garbage had been hauled away from the airport since 1956 under a contract between St. Louis and a private contractor. However, Berkeley had evidence of McDonnell and St. Louis and its concessionaires dumping garbage and refuse along the creek banks, near the Berkeley borders, causing infestation of rats and packs of dogs in and around the city; and that there was also a dump of radioactive material. (A child was attacked and killed by a pack of dogs in Hazelwood in 1959.) Berkeley had equipment for mosquito control which reduced mosquito numbers within its borders but St. Louis had no mosquito control program or equipment for providing such service at the airport. Berkeley had a

rabies control contract with the St. Louis County Health Department but St. Louis had never requested county rabies control over its properties. The Director of the Sanitation Division of the County Health Department and the Executive Director of the Metropolitan Sewer District found the water of Coldwater Creek contaminated before it entered the airport and said they could detect no difference in amount of pollution before and after it left the airport. Berkeley has a plumbing code, stated to be stronger than the County Code from the standpoint of health and welfare because it requires licensing, inspection of work and control over those doing the work. It also provides mechanical, building and electrical inspection. Berkeley had a sewage treatment plant which the Executive Director of the Metropolitan Sewer District said was a primary treatment plant only and had an efficiency of approximately 25%. Both Berkeley and the proposed annexed area obtain basic health services from the St. Louis County Health Department.

Berkeley contends that annexation and control by it would improve all these conditions. It is thus argued:

*Traffic*: That the solution requires a single controlling authority with jurisdiction over the entire area; that Berkeley has planned six miles of improved traffic arteries and installation of automatic traffic control devices; and that the greatest area congestion comes from the McDonnell and airport parking lots.

*Police Protection*: That McDonnell's guards only protect its property and not public property; that St. Louis watchmen do not patrol beyond their building; that the county police force is understaffed and mainly patrol the highways outside; that thievery from cars and other crimes are not prevented; and that Berkeley could furnish the force and equipment to prevent criminal activities.

*Fire Protection*: That aircraft crashes occur outside the airport and in Berkeley; that the St. Louis force acts to save planes and passengers and not Berkeley property; that St. Louis relies too much on leased navy equipment; that the St. Louis "backup" equipment is too far away; and that Berkeley can furnish adequate equipment backed up by nearby fire departments.

*Sanitation, Health and Welfare*: That Berkeley could prevent dumping, eliminate stray dog packs and rodents, and provide rabies and mosquito control; that Berkeley could force removal of the uranium pile in the Mallinckrodt dump; that essential inspection services could be provided; and sewers could be completely enclosed and put underground.

This case must be decided on the basis of the situation as it was at the time of the 1959 annexation proceedings, although of course evidence showing the history and development of the airport and Berkeley was properly considered to explain this situation. The trial court made findings, summarized by plaintiffs, as follows:

"1. That the land owned by the City of St. Louis was used and available only for Airport purposes and related and allied activities, and that the land owned and occupied by McDonnell was utilized only for its designing and manufacturing operations and was not available for other use.

"2. That the growth and development of the annexed area was due solely to the efforts and expenditures of St. Louis and McDonnell and was in no way attributable to the proximity of Berkeley which had made no contributions to it.

"3. That there has been no growth from Berkeley into the annexed area.

"4. That the land in the annexed area is not, and will not be in the foreseeable future, available for residential, commercial or industrial use.

"5. That there are large amounts of vacant lands within Berkeley available for industrial and commercial development.

"6. That none of the annexed area is needed for the municipal purposes of Berkeley.

"7. That the land has no special value by reason of its adaptability for prospective city uses.

"8. That the annexed area is located in St. Louis County which, pursuant to charter authorization, provides municipal services.

"9. That police protection is furnished by St. Louis County, the St. Louis Airport police and McDonnell's security guard force; that there is little crime or criminal activity in the area; and that police protection is fully adequate.

"10. That fully adequate public health services are furnished by the St. Louis County Health Department.

"11. That the safety inspection services furnished by the St. Louis County Department of Public Works are fully adequate.

"12. That the area is zoned under a county-wide ordinance and pursuant to county-wide zoning plans.

"13. That there are no public streets within the annexed area and that the county police department enforces traffic regulations.

"14. That the Metropolitan St. Louis Sewer District has exclusive jurisdiction over public sewers both in Berkeley and the annexed area.

"15. That fully adequate crash and structural fire protection is provided by the St. Louis and McDonnell Aircraft fire departments.

"16. That water, gas and electricity are furnished by private corporations.

"17. That governmental facilities presently furnished to the annexed area are fully sufficient and adequate for its protection and for the public welfare.

"18. That no activities or conditions in the area constitute a threat to the health, welfare or safety of Berkeley or its residents.

"19. That Berkeley furnishes no services not presently available to the annexed area and that many of appellant's municipal services are supplied by St. Louis County.

"20. That no substantial benefits would accrue to respondents as a result of the annexation and that the substitution of services by Berkeley would merely result in substantial tax burdens on respondents without reciprocal benefits.

"21. That the interests of St. Louis County as a whole in the annexed area and in the protection and development of Lambert-St. Louis Municipal Airport are greater than that of any one of its 99 municipalities.

"22. That the purported annexation is unreasonable under all of the evidence."

Of course Berkeley could not annex the McDonnell buildings without annexing the airport because the McDonnell land does not adjoin Berkeley being separated from it by a considerable part of the airport land. Thus the decisive question is the right to annex the airport (which is about 90% of the area) and we cannot find that Berkeley has made a case for such annexation because we believe the findings of the trial court are supported by the overwhelming weight of the evidence. In the first place, the airport was established before Berkeley. This court upheld the right of St. Louis to establish, own and operate it in 1928, under its charter powers, before there was any state legislation on the subject. Dysart v. City of St. Louis, 321 Mo. 514, 11 S.W.2d 1045. In 1929, our legislature provided broad authority for any city to own and operate an airport (now Sec. 305.170) and declared this to be a "public purpose" and a "public necessity", conferring the power of eminent domain for acquisition (now Sec. 305.190) and authorizing issuance of bonds for its establishment (now Sec. 305.-200). Berkeley did not come into existence for almost a decade after the airport

and it does not seem to be unreasonable to consider that the development of the area resulted much more from the airport than from Berkeley, particularly in view of the fact that the airport is now adjoined by five other towns containing some of the greatest industrial developments in the state. The largest industrial complex is in Hazelwood north of the airport and there also are still other towns adjoining Berkeley and the other towns around the airport. Berkeley claims homogeneity with the annexation area as the common center of utilities, served by the same railroad, roads and highways, with common problems of traffic and zoning.

Berkeley cites Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860, in which it was said: "In questioning the reasonableness of the annexation, it is no decisive factor that the annexed territory may be primarily indebted to the City of St. Louis rather than to the City of Pagedale for its development into an urban community and for the location of the larger industrial plants within its borders. The same thing could as well be said of all the other communities within the metropolitan area of the City of St. Louis; and perhaps the frank truth of the matter is that both the original territory and the newly annexed territory of the City of Pagedale owe their development to such common source." However, in that case, the court found a community of interest between the original and annexed territory in same types of residences and businesses and same thoroughfares serving to unite them into a common community. Exactly the opposite is true here. There can be no residences or business buildings of Berkeley citizens on the airport and no Berkeley streets can be constructed into the area. It would be difficult to conceive of two areas more completely separate in every respect than the predominately residential city of Berkeley (with industries now developing in its original limits) and the great airport of St. Louis devoted to interstate and international air commerce and

travel. Since Berkeley cannot in any way expand into the airport for its industrial, commercial or residential development or use its area for any city installations, there is no community of interest between the two areas from the standpoint of municipal land use and development as a single unified city as in the Pagedale case.

We have held that St. Louis acts in a proprietary capacity in owning and operating its airport. American Airlines, Inc., v. City of St. Louis, Mo.Sup., 368 S.W.2d 161; see also Behnke v. City of Moberly, Mo.App., 243 S.W.2d 549, 553; 6 Am.Jur. 25, Aviation, Sec. 37; Annotation, 66 A.L. R.2d 634. However, it is not unusual for cities to have installations and institutions outside their borders, with full authority over them. (See Cities of Fourth Class, Secs. 79.380, 79.390, 79.430; Constitutional Charter Cities, Sec. 82.240; General Provisions, Sec. 90.010; First Class Cities, Sec. 90.070; Special Charter Cities, Sec. 91.593; Municipal Utilities, Secs. 91.040, 91.070; see also 6 McQuillin, Municipal Corporations 564, Sec. 24.57, and Vol. 10, p. 10, Sec. 28.05.) Surely it would be unusual and abnormal for a large public installation of one city to be placed within the boundaries and control of another city, particularly such an installation as this large airport (over which St. Louis has been given statutory authority) requiring an extensive area and the utmost care and closest supervision in its operation. Furthermore, the cooperation of another city in the control of such a facility could often vary with changing administrations according to election issues and results. The extent to which St. Louis might be given police power at the airport is not before us but "it is not unusual to grant cities and towns the right to exercise police power beyond their corporate limits." McQuillin, Sec. 24.57; see also above statutory citations. However, at this airport, the City now relies on county police authority, furnished under contract, to supplement its force of watchmen. Moreover, it is also to be considered that all aircraft operations

are under the exclusive control of a U. S. Government agency and annexation could not change that. Therefore, it is difficult to see any advantage to the public using the airport, to St. Louis County or to St. Louis from annexation of the area by Berkeley. Instead it appears that divided authority could hinder efficient operation, particularly in crash fire protection for planes and rescue of passengers, perhaps also in the intricate and classified operations of McDonnell at its main plant, and in the military uses of the airport. The wartime request for Berkeley to give up annexation of the area is an indication of deleterious effects of divided control.

Annexation, of course, could be of great financial benefit to Berkeley. Although land owned by St. Louis would not be subject to property taxes, the property of McDonnell, the airlines and other airport tenants would be. Evidence showed present taxable property of Berkeley to be about $21,000,000.00 and that property in the annexed area would add at least $12,500,000.-00. Additional tax revenue would also come from motor and aviation fuel taxes, from utilities' gross receipts tax, from merchants and manufacturers' tax, from motor vehicle licenses and from taxes on flight equipment of airlines. As noted, the court found plaintiffs would receive no substantial additional benefits from these added tax burdens and in view of the kind of operation the airport requires we reach the same conclusion. The traffic condition is a problem of all the cities adjoining the airport and not just a Berkeley problem. If Berkeley took over the area, there would still be traffic from five other adjoining towns, from state and interstate highways in the area and from other nearby towns and cities. Thus the only reasonable view seems to be that traffic is too great a problem from too wide an area to be solved by a single city but instead is a county problem (likewise police protection, health and sanitation) and best dealt with and controlled by the county government with the cooperation of St. Louis and all the ad-joining municipalities. Drainage and sewers, in Berkeley, the airport and the adjoining towns, are already under the exclusive control of the Metropolitan Sewer District which has ample authority over them. The principal reason for establishing the Metropolitan Sewer District was that no single city could possibly control the situation. See State on inf. Dalton v. Metropolitan St. Louis Sewer District, 365 Mo. 1, 275 S.W.2d 225, 231. Adoption of the county charter, the establishment of the County Police Department and the establishment of the Metropolitan Sewer District have changed the situation materially from that existing for awhile after the end of World War II. Fire protection at the airport requires specialized training and unusual equipment. Divided control could be disastrous. While Berkeley could buy the necessary equipment (and asserts willingness to do so) it seems essential to the welfare of the traveling public that the required equipment be on the airport devoted to full time use there and subject only to the control of its officers.

■ The fact that the area sought to be annexed by Berkeley is this large airport, established, owned, developed and maintained by St. Louis, makes this case different from any case cited by the parties, and in our view taking away its control from St. Louis would be inherently unreasonable under all the circumstances. It is in no way similar to the Kansas City cases (State ex inf. Taylor ex rel. Kansas City v. North Kansas City, supra; State ex inf. Major v. Kansas City, supra) on which Berkeley relies, in which Kansas City had been expanding for years into the open areas annexed and clearly required the whole territory involved for future growth which the evidence showed was reasonably to be anticipated. We cannot find that the airport area really needs municipal services from Berkeley, or that Berkeley's control would solve the problems discussed; and it obviously is not an area which Berkeley can use for commercial, industrial or residential growth. Instead it

512

appears that annexation would cause more problems than it could solve and that interference with the control of St. Louis of this great enterprise of highest public utility and purpose cannot be justified on the facts shown. Therefore, our conclusion must be and is that there is not a sufficient showing of reasonableness of such an annexation to make that issue a fairly debatable one and that this annexation is arbitrary, unreasonable and invalid.

The judgments in both cases are affirmed.

All concur.